**Jorge E. APONTE and his wife; Daniel Pagan, his wife, and the conjugal partnership constituted between them, Plaintiffs,**

v.

**Sila M. CALDERON, in her personal and official capacity as Governor of Puerto Rico, her husband, Adolfo Krans, and the conjugal partnership constituted between them; David Noriega–Rodriguez, in his personal and official capacity as President of the Independent Citizens' Commission to Evaluate Governmental Transactions, his wife, Jane Doe, and the conjugal partnership constituted between them; Ileana Colon–Carlo, her husband John**

Doe, and the conjugal partnership constituted between them; Carmen Rita Velez–Borras, her husband John Doe, and the conjugal partnership constituted between them; Pedro Galarza, his wife Jane Doe and the conjugal partnership constituted between them; Pedro Lopez–Oliver, his wife Jane Doe and the conjugal partnership constituted between them; Angel Hermida, his wife Jane Doe and the conjugal partnership constituted between them; all in their personal and official capacities as members of the above-mentioned Commission; Unknown Defendants X, Y, and Z; Insurance Companies A, B, and C, Defendants.

No. CIV. 01–1963(JAF).

United States District Court,
D. Puerto Rico.

Nov. 29, 2001.

John F. Nevares, Smith & Nevares, San Juan, PR, Carlos R. Ramirez, San Juan, PR, Carlos Lugo-Fiol, San Juan, PR, for Jorge E. Aponte, Daniel Pagan.

Salvador J. Antonetti-Stutts, Director, Dept. of Justice of PR, Federal Litigation Div., San Juan, PR, for Sila Maria Calderon, Adolfo Krans, Conjugal Partnership Krans-Calderon.

Rafael Escalera-Rodriguez, Nestor J. Navas-DÁcosta, Reichard & Escalera, San Juan, PR, for David Noriega-Rodriguez, Ileana Colon-Carlo, Carmen Rita Velez-Borras, Pedro Galarza, Pedro Lopez-Oliver, Angel Hermida.

## OPINION AND ORDER

FUSTE, District Judge.

### I.

### Introduction

This is an action for a declaratory judgment, injunctive relief, and damages, in which Plaintiffs seek redress for the purported violation by Defendants of their constitutional rights to freedom of speech and association, to the equal protection of the laws, and to due process of law, as guaranteed by the First, Fifth, and Fourteenth Amendments to the United States Constitution. U.S. CONST. amends. I, V, XIV. The complaint is brought under the provisions of 42 U.S.C. § 1983 (1988 & Supp. I 2000).[1] Jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1343 (1993).

Plaintiffs challenge the constitutionality of the Independent Citizens' Commission to Evaluate Government Transactions, popularly known as the Blue Ribbon Commission, created by Defendant Governor Sila M. Calderón, of the Commonwealth of Puerto Rico, through Executive Order No. 2001–06.

Prior to the November 2000 general election, Sila M. Calderón, as gubernatorial candidate for the Popular Democratic Party, publicly accused the administration of the New Progressive Party in power from 1992 to 2000 with wide-ranging public corruption.[2] The Popular Democratic Par-

1. The statute provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. § 1983.

2. In the government program proposed by Defendant Calderón during her campaign, she suggested the creation of a Blue Ribbon Commission "that will examine the major or more controversial transactions carried out by the present government." *Pls.' Exh. 21.*

Body.

ty supports maintenance of the current political status of Puerto Rico in relation to the United States. *See* 48 U.S.C. §§ 731–914 (1982 & Supp. I 2001). The New Progressive Party advocates for Puerto Rico to become a state. As part of the political platform of the Popular Democratic Party, then-candidate Calderón promised to create a Blue Ribbon Commission to investigate corruption committed by public officials under the New Progressive Party administration.

Plaintiffs Jorge E. Aponte and Daniel Pagán were high-ranking officials in the targeted New Progressive Party administration. Plaintiff Aponte, a certified public accountant ("CPA"), was the Director of the Office of Management and Budget of the Commonwealth of Puerto Rico during the years 1993 to 2000. Plaintiff Pagán, an engineer, was the outgoing Secretary of the Puerto Rico Department of Natural and Environmental Resources (known by its Spanish acronym, "DRNA"). Both officials responded directly to the New Progressive Party Governor, Dr. Pedro Rosselló, and they held their public positions until December 31, 2000.

Defendants are Governor Sila M. Calderón and the members of the Blue Ribbon Commission. The members of the Blue Ribbon Commission all sympathize with the present Popular Democratic Party administration and its quest to investigate the preceding administration. At the November 6–8, 2001 hearing held before this court, none admitted their specific political party affiliation, and all appear to be supporters of political ideologies other than that of the New Progressive Party or so-called independent voters.

## II.

### *The Creation of the Blue Ribbon Commission*

The moving force behind the formation of the Blue Ribbon Commission is Governor Sila M. Calderón's political promise to investigate public corruption by officers of the outgoing New Progressive Party administration. Prior to the promulgation of Executive Order 2001–06, Defendant Calderón requested the persons she had selected to be members of the Commission to conduct research regarding the constitutionality of the body she intended to create. With the exception of one Defendant, who is a CPA, all of the past and current members of the Commission hold law degrees. Three Defendants are former judges. The Commissioners performed extensive research on the constitutionality of the Commission and its precise purposes prior to Defendant Calderón's declaration of Executive Order 2001–06.[3]

The enabling executive order cites unprecedented corruption in public management, which, according to its terms, requires total eradication to reestablish the trust of the citizens of Puerto Rico in

---

At the injunction and declaratory judgment hearing on November 8, 2001, Defendant Calderón testified that she had been referring to the New Progressive Party administration of Governor Rosselló that had been in power at the time. In the government plan titled "Frontal Attack on Corruption and Certain Punishment for the Corrupt" published on the website of La Fortaleza, the Governor's Office, Defendant Calderón deplored the fact that "[t]he ongoing public spectacle of rampant corruption which has been exhibited by the present Administration has embarrassed the people of Puerto Rico and outraged our citizenry." *Pls.' Exh. 22.* Defendant Calderón was again referring to the Rosselló administration.

**3.** The record does not include any published legal opinion or official document by the Commissioners regarding the constitutionality of the Blue Ribbon Commission, nor is the court aware that any such document exists.

government institutions. The executive order seeks the cooperation of all public employees and the entire citizenry in the fight against public corruption and conceives the independent commission composed of private citizens to be representative of society. The commission is given power to:

FIRST: ... evaluat[e] significant government transactions, both of the past and present administrations, which in the judgment of the Commission itself, warrant evaluation.

SECOND: ... (a) evaluate significant government transactions conducted by agencies of the Executive Branch of the government of the Commonwealth of Puerto Rico, both during the past and present administrations, which in the judgment of the Commission itself warrant evaluation.... Those transactions shall be considered significant which, in the Commission's judgment, whether because of the amount involved therein or because of other characteristics, have the potential of substantially impacting on areas such as the government structure, the public treasury, the country's economy and infrastructure, or the citizenry's trust in government institutions.

(b) ... request from any natural or artificial person, whether or not a public functionary or employee, every sort of information regarding any government transaction which is under evaluation by the Commission, when in the judgment of the Commission itself, that information is pertinent to the evaluation process.

(c) ... require the assistance of functionaries belonging to the Executive Branch in order to obtain, through the mechanisms provided by law, the appearance of any person or the delivery of any document or object, whensoever this shall be necessary and warranted.

THIRD: ... issue to the Governor such reports as the Commission itself deems appropriate, with the partial or final results of the evaluations which the Commission has carried out or is carrying out. Said reports shall include such findings as have resulted from those evaluations, and may also include recommendations, both short- and long-term, that such actions as the Commission deems advisable be taken, including, but not limited to, recommendations that new statutory or regulatory rules be adopted to govern such transactions or that existing ones be modified, *or that administrative, civil or criminal procedure be undertaken against certain persons.* Such reports shall be disclosed solely by the Governor, except when in her judgment this may interfere with the successful carrying out of such actions as may be necessary in light of the contents of the report in particular.

FOURTH: The Governor's Office shall provide the Commission with an office where it may perform its functions. The Commission's administrative operations shall be carried out through the Department of State. The Department of State, *the Department of Justice,* and the other government agencies under the authority of the Governor's Office, are authorized and ordered to provide the Commission with such support as is necessary to enable the Commission to successfully carry out its mission, including, but not limited to, technical support, support, of personnel equipment [sic], and the hiring by the agency of such additional staff as the Commission may need. Requests for support from the Commission shall be channeled through the Chief of Staff.

. . . .

SIXTH: ... make its decisions by a majority of the total number of its mem-

bers.... The work of the Commission shall be carried out in strict confidentiality. The information to which the members of the Commission have access as a result of their functions on the Commission shall be deemed strictly privileged, and may not be revealed for use by any of them for any purpose other than the work of the Commission. Subject to the provisions of this Executive Order, the Commission may adopt such other rules as it deems appropriate to govern its own internal functioning.

SEVENTH: The chairperson of the Commission shall organize and direct the work of the Commission, and shall be its only spokesperson. He or she may carry out any other activity which is entrusted to him or her by the Governor or by the Committee [sic] which is necessary to better fulfill this Executive Order.

*Docket Document No. 7, Exh. 1* (emphasis added).

The Commission is composed of five members appointed by the Governor. David Noriega–Rodríguez, an attorney-at-law, former legislator, and advocate for the Puerto Rico independence movement, acts as chairperson. Ileana Colón–Carlo, a CPA, an attorney-at-law, and former Comptroller of Puerto Rico, along with Carmen Rita Vélez–Borrás, an attorney, former Secretary of Justice for the Commonwealth, and former Superior Court Judge, are members of the Commission. Both claim to be politically independent. Ms. Colón–Carlo, however, was appointed Comptroller by Governor Rafael Hernández Colón and actively participated in Governor Calderón's campaign. CPA Pedro Galarza, a former president of the Puerto Rico Telephone Company under a previous Popular Democratic Party administration, was a member who recently resigned from the Commission for personal reasons. His

position has not been filled. Attorney Pedro López–Oliver, a retired Superior Court Judge, formed part of the Commission until late June 2001. He resigned from the Commission, and has been substituted by former Superior Court Judge Angel Hermida, who also claims to be an independent voter. The members of the Commission serve at the pleasure of the Governor and can be removed by Defendant Calderón at any time. The Commissioners receive compensation for their efforts through professional services contracts with the Governor's Office.

The Commission is empowered to act *sua sponte,* but nothing in Executive Order No.2001–06 impedes the Commission from acting on a referral basis, whether from private or public sources.

Upon the Commission's decision to investigate a particular governmental transaction, its members proceed by private, confidential, and strictly privileged hearings to ascertain the facts pertaining to alleged violations of governmental policy, irrespective of whether the consequences for the persons under investigation are civil or criminal in nature. To carry out this function, the Commission has the power to make appropriate rules and regulations, to employ attorneys, investigators, and other staff members, to compel the attendance of witnesses with the assistance of the agencies of the executive branch of government, to examine them under oath, and to require the production of books, records, and other evidence. *See Docket Document No. 7, Exh. 1.* Since the entire machinery of the executive branch is at its disposal, the Commission can technically enforce its orders seeking attendance of witnesses or production of books, records, and other evidence by petition to the state courts for contempt proceedings. *Id.* Although the Commission has the power to request the aid of other executive branch

agencies to compel the testimony of a particular witness or the disclosure of documentary evidence, the Commission claims that it has never done so because the Commissioners decided informally that they would not avail themselves of this power bestowed upon them. We note that the internal determination by the Commissioners that they would not compel a witness to testify through service of a subpoena had not been previously divulged to the public, and we have seen no contemporaneous amendment to the executive order or to any of the Commission's regulations to that effect.

On paper, the scope of the Commission's investigative authority is not explicitly limited by the enabling executive order to violations of criminal laws. However, the Commission's involvement in probing criminal violations is patently clear from the executive order and is reinforced by the availability through that order of the executive branch's investigatory resources, including the Department of Justice of Puerto Rico, to assist the Commission in its activities.

Since its creation, the Commission has rendered reports in three distinct transactions, two of which are the object of this suit. The transactions are, first, the lease and purchase of a building located at Barbosa Avenue 306 and an adjacent parking lot on Italia Street, Hato Rey, Puerto Rico. The second pertains to the relationship between the Department of Natural and Environmental Resources and the Solid Waste Authority and a corporate entity known as the Puerto Rico Infrastructure Management Group, Inc. ("PRIME"). In both cases, the Commission has submitted reports to the Governor. The findings have been private in nature, following the tenor of Executive Order No.2001–06. However, the reports have been the object of news conferences presided over by Governor

Calderón and some members of the Blue Ribbon Commission, and copies of the reports have been made available to the press for publication. In both instances at issue here, these press conferences and the publicized reports find that there is probable cause to believe that violations of Puerto Rico criminal law have occurred. The findings of the Commission in these two cases are a matter of public record, not because the enabling executive order provides such a mechanism, but because the findings of the Commission have been made available to the general public in the manner outlined above.

The Commission and the Governor have also reported the findings to the Puerto Rico Department of Justice and have referred the matters to them for further proceedings. In certain instances, the Commission obtained information relating to criminal activity and immediately forwarded such evidence to the Governor. The Governor then referred the information to the Department of Justice for further action, even before the issuance of the Commission's report to the Governor and the publication of such report through press conferences.

The Blue Ribbon Commission approved a set of operational by-laws during its regular meetings held on February 20 and March 13, 2001. During the hearing held by this court on November 6–8, 2001, we heard testimony that a second set of by-laws that had been deemed strictly confidential had also been approved on February 27 and March 27, 2001. Surprisingly, these regulations have not been considered for official publication in accordance with Puerto Rico's Uniform Administrative Procedure Act. See 3 L.P.R.A. § § 2101–2201 (1992 & Supp. I 1998). These norms for investigation and preparation of reports cover topics such as the solicitation of assistance from the executive branch to com-

pel the attendance of witnesses and the production of documents, the issuance of summonses, directives as to the course of action to take when an attending witness refuses to testify or produce documents, the manner in which interviews are to be conducted and sworn statements are to be taken, the procedure for interviewing witnesses suspected of having committed violations of criminal laws, and norms of confidentiality. The salient aspects of this confidential set of rules are quite revealing. Witnesses are forbidden from taking notes, and they cannot record their testimony. The Commission is directed not to provide copies of the statements made by witnesses upon their request. The hearing officer or person in charge of the investigation may seek the presence of a prosecuting attorney or other representative of the Department of Justice during any interview when such presence would advance the purposes of the interview. There is no required method of recording the proceedings. Interviews or interrogations can be recorded or taken by a court reporter or simply reduced to writing by the examining officer as the witness testifies. *See Addendum "A" to this Opinion and Order.*

As indicated above, the Commission has the power to compel the attendance of witnesses. A witness is only given limited notice of the subject matter of the investigation before being asked to appear and testify. The witness may be allowed to bring an attorney to the interview. The Commission, however, limits the participation of the attorney. Counsel may not question his client as to any relevant matter. The witness and his counsel have no right to examine other witnesses. The Commission does not recognize the right to cross-examine witnesses. The procedure is such that the witness or his attorney may not even submit to the Commission proposed questions to be asked of any

other witness appearing before it, inasmuch as the Commission has sole authority to decide what to ask and what must be produced.

The executive order that creates the Commission does not provide a person who might be incriminated or defamed as a result of the publication of the Commission's report an opportunity to further appear and be heard, or to call a reasonable number of witnesses on his behalf.

The Commission employs a staff to conduct investigations of past government transactions. The Commission's investigative staff includes: Attorney and former Special Independent Prosecutor Brenda León–Suárez, executive director of the Commission; attorney José Sagardía; attorney Gilberto Vilá–Pérez; CPA Luis E. Gutiérrez; and attorney Nilsa García. These investigators conduct hearings, at which they receive testimony from witnesses. León–Suárez provides periodic progress reports regarding the status of ongoing investigations to the Commissioners. The Commissioners analyze the sworn statements, documentary evidence, and notes on interviews of witnesses collected by the investigative staff, and León–Suárez, in conjunction with the other investigators, prepares a draft of the factual findings that will serve as the basis for the Commission's report to the Governor. The Commissioners then discuss the findings and draft the conclusions and recommendations portions of the report.

In addition to the factual findings, conclusions, and recommendations contained in the main body of the report, the Governor also receives the report's exhibits, which consist of letters, contracts, electronic mail print-outs, notes of interviews, and sworn statements obtained by the Commission. After the report is submitted to the Governor, the Commissioners

discuss their findings with her prior to the holding of a press conference.

## III.

### The Blue Ribbon Commission's Investigation of Plaintiffs

#### A. Plaintiff Jorge E. Aponte

On March 21, 2001, an armed agent of the Special Independent Prosecutor's Office, along with a Treasury Department agent, delivered a summons to the home of Plaintiff Aponte. *Pls.' Exh. 18.* The summons requested Plaintiff Aponte's appearance at a hearing scheduled for the afternoon of March 29, 2001. The document did not indicate the specific subject matter of the hearing.

Plaintiff Aponte appeared at the Commission's office in the Red Palace building annexed to La Fortaleza, the Governor's mansion, in San Juan, at the designated time. He hand-delivered a letter to León–Suárez, requesting the following: A copy of Executive Order No.2001–06; a copy of the Commission's bylaws; the specific topic to be discussed at the hearing; a copy of any opinion by the Puerto Rico Secretary of Justice explicating the legal basis for the Commission to be able to compel witnesses to appear before it, if any such opinion existed; and information regarding the appointment of counsel to assist him in these proceedings. León–Suárez informed Plaintiff Aponte that she would forward his requests to the Commissioners, but she was certain that he was not entitled to appointment of counsel in connection with the Commission's investigation.

León–Suárez submitted a written response dated April 11, 2001, to which she attached a copy of Executive Order 2001– 06 and the Commission's bylaws, as requested by Plaintiff Aponte.[4] León–Suárez informed Plaintiff Aponte that the Commission was interested in his testimony in relation to the purchase of the 306 Barbosa Avenue building and the contiguous lot at 307 Italia Street. The letter summoned Plaintiff Aponte to appear at a hearing scheduled for April 19, 2001.

Plaintiff Aponte attended the hearing in part because León–Suárez had assured him that his role in the proceedings was only to testify to the validity or authenticity of certain documents. Plaintiff Aponte was not aware that the Commission was investigating him for misconduct. He believed that if he refused to appear, the Commission would conclude that he was hiding something. Plaintiff Aponte had reviewed the executive order and bylaws of the Commission which he had been provided, and he had determined that if he did not appear before the Commission as required pursuant to said documents, he would have been forced to appear under compulsion of legal process.

On April 19, 2001, Commission investigators León–Suárez, Sagardía, Gutiérrez, and Vilá–Pérez interviewed Plaintiff Aponte. Plaintiff Aponte informed the investigators that he believed the Commission was unconstitutional. He asked to record or take notes of the hearing, but León–Suárez refused those requests. When the investigators began to take notes of the proceedings, Plaintiff Aponte asked for a copy of their notes, but his request was denied. León–Suárez asked Plaintiff Aponte if he was willing to have a stenographer record the hearing. Since Plaintiff Aponte could not verify whether the stenographer's record would be accu-

---

**4.** León–Suárez only provided Plaintiff Aponte with a copy of the first set of operational bylaws approved by the Commission, not the second set of procedural bylaws that governed the procedure for collecting information from witnesses that remained strictly confidential until it surfaced at the hearing held by this court.

rate and considering that he did not have the assistance of an attorney, he declined.

During the hearing, Plaintiff Aponte was not advised of any constitutional rights that may have applied to him. The Commission's investigators questioned him regarding the Barbosa 306 transaction. The investigators' report of interview forms part of Court Exhibit 4–3. Court Exhibits 4 and 8 are photocopies made by the court of additional exhibits ordered to be produced. These are the reports of interview, sworn statements, and Part II of the PRIME report. They cover both transactions under scrutiny. *See* Minutes of In–Chambers Proceedings, dated November 29, 2001, *Addendum "B" to this Opinion and Order.*

## B. *Plaintiff Daniel Pagán*

On March 22, 2001, an armed agent of the Puerto Rico Department of Justice Special Investigations Bureau, which is known by its Spanish acronym "NIE", served Plaintiff Pagán at his home with a summons to appear before the Blue Ribbon Commission on March 27, 2001. *Pls.' Exh. 1.*

In a letter dated March 26, 2001, Plaintiff Pagán notified León–Suárez that he had a previous appointment to appear before the Puerto Rico House of Representatives the following day. *See Pls.' Exh. 2.* Plaintiff Pagán informed León–Suárez that although he believed the Commission did not have the authority to issue summonses compelling witnesses to appear before it, he was more than willing to cooperate with the work of the Commission. Plaintiff Pagán spoke with attorney Andrés Guillemard regarding the drafting of the letter.

Plaintiff Pagán believed that, although the Commission did not have the power to subpoena him, he was required to appear before it based on his previous experience of working with the Department of Justice

and the NIE in investigations of other persons. In those prior investigations, formal actions had been initiated against certain individuals. In light of the fact that an armed law enforcement agent had appeared at his home to serve him with a summons from the Commission, Plaintiff Pagán perceived that the situation was very grave and he felt he had a responsibility to make an appearance.

On the morning of April 25, 2001, Plaintiff Pagán appeared at the Commission's offices in the Red Palace. Plaintiff Pagán arrived alone because he believed he did not need the assistance of an attorney. León–Suárez, attorney Vilá–Pérez, and auditor Gutiérrez conducted the three-hour interview of Plaintiff Pagán.

According to Defendant Noriega–Rodríguez, the Commissioners did not suspect Plaintiff Pagán of having engaged in criminal conduct at the time of his appearance before the Commission. However, we note that at the time Plaintiffs Pagán and Aponte were interviewed, the bulk of the investigation had been completed. Plaintiff Pagán was the last witness to be called before the Commission. *See Court Exh. Nos. 4–2, 4–3.* Plaintiff Pagán was not given any specific advice about any right that may have attached to him in the context of the Commission's investigation. He was not advised of any circumstance under which he would have had the right to have an attorney present at the hearing. He was not told that he had a right to remain silent. Plaintiff Pagán was not informed that he had a right to bring witnesses or present other evidence on his behalf. He requested that he be allowed to take notes of or record the investigative hearing. León–Suárez denied both of Plaintiff Pagán's requests. Vilá–Pérez equated the interview with a grand jury proceeding, and he explained to Plaintiff Pagán that witnesses testifying before a

grand jury were not allowed to take notes or record the proceedings. Plaintiff Pagán then realized that he was the subject of the Commission's investigation. He requested that León–Suárez provide him with a copy of the internal procedural guidelines used by the Commission. León–Suárez agreed to answer his request at a later date, but then failed to do so. Plaintiff Pagán did not request the assistance of counsel.

At the hearing, Plaintiff Pagán offered information and documentary evidence to the Commission. He did not testify under oath and he did not sign any sworn statement, but the investigators reduced his interview to writing. *See Report of Interview, Court Exhibit 4–3.* Plaintiff Pagán was not confronted with any witnesses testifying against him.

On May 9, 2001, Defendants Calderón, Noriega–Rodríguez, and other Commissioners held a press conference to disclose the findings of the Commission's investigation regarding the lease and purchase of the Barbosa building. Prior to the press conference, Defendant Calderón had met with leaders of the Puerto Rico legislature, one of whom had stated publicly that the Commission's report contained accusations of a criminal nature.

The report was titled, "Irregularities in the Acquisition of the Building Located at 306 Barbosa and the Adjacent Lot at 307 Italia Street." *Pls.' Exh. 4.* At the press conference, Defendant Calderón announced that she was referring the matter to the Secretary of Justice of the Commonwealth of Puerto Rico, as the Commissioners had recommended. In addition to the accusations of criminal misconduct included in the report against both Pagán and Aponte, at the press conference Defendant Noriega–Rodríguez speculated that Plaintiff Aponte might have profited personally from the Barbosa transaction. At the time of the press conference, Plaintiffs Pagán and Aponte had not been given an opportunity to respond to the Commission's conclusions. In fact, neither had received a copy of the report.

With regard to Plaintiffs, the report makes the following specific conclusions:

As a direct consequence of contracts approved in 1998 and 1999 by the CPA Jorge Aponte, then Director of the Office of Management and Budget (OGP), and by the engineer Daniel Pagán, then Secretary of the Department of Natural and [Environmental] Resources, in the process of acquiring for government purposes the building located at 306 Barbosa Avenue and the adjacent lot at 307 Italia Street, and between the lease and the purchase of those properties, public funds were paid out, amounting to $9,300,000, which sum is more than $7 million in excess of the fair market value of said properties. In the face of that situation, all possible legal avenues (administrative, civil, or criminal) which might allow the public treasury to recover the aforesaid excess, must be explored.

... The data compiled by the Commission in this case clearly revealed that both CPA Jorge Aponte, then Director of the OGP, and engineer Daniel Pagán, then Secretary of the DRNA, at the very least were grossly negligent in assigning the function of negotiating a multi-million-dollar transaction to certain subordinate functionaries who, in the Commission's judgment, lacked the necessary capability to handle a matter of such magnitude. Those data further reveal that both Messrs. Aponte and Pagán at the very least were repeatedly and grossly negligent in failing to adequately supervise the dealings that their aforesaid subordinates were making in the aforesaid transaction.

*Pls.' Exh. 4.* In their report, Defendant Commissioners also speculate that the Barbosa 306 transaction may have been hampered by "improper influences," and there may have been a conspiracy to defraud the public treasury.

On May 11, 2001, Plaintiff Pagán submitted a written request to León–Suárez for a copy of the Commission's report. *Pls.' Exh. 5.* Three days later, León–Suárez notified Plaintiff Pagán that she was not authorized to provide him with a copy of the report, and that she had forwarded his letter to La Fortaleza. *Pls.' Exh. 6.* On May 15, 2001, Defendant Calderón's legal advisor informed Plaintiff Pagán that he could obtain a copy of the document through La Fortaleza. *Pls.' Exh. 7.* Plaintiff Pagán picked up a copy of the Commission's report, which was missing the exhibits of the evidence relied upon by the Commission and forwarded to the Governor.[5]

In a letter dated July 30, 2001, León–Suárez requested Plaintiff Pagán to appear for a second time before the Blue Ribbon Commission on August 6, 2001, in relation to its investigation of the remodeling of the Barbosa 306 building and of the contract between PRIME and the Solid Waste Authority, which is known by its Spanish acronym "ADS". *Pls.' Exh. 3.* The summons was delivered via certified mail with return receipt requested. Plaintiff Pagán chose not to appear at the scheduled hearing.

In late October 2001, the Commission delivered the first part of a report on its investigation into the contract between the Solid Waste Authority and PRIME. On October 31, 2001, Defendants Calderón and the Commissioners held a news conference to expose the contents of the report. The PRIME report included the following paragraph:

Then-secretary of the DRNA, Engineer Daniel Pagán Rosa, improperly intervened in the stage of reconsideration of the awarding of a bid procedure to the ADS for a project for the recovery of clean material at the municipality of Toa Baja in particular. And after the bid board of the ADS had adjudicated said bid and they had reaffirmed their decision to deny a motion for reconsideration, Engineer Pagán Rosa ordered the president of the bid board to cause the disappearance of the documents which evidenced this last decision of the board, and in its place the board should annul the previously adjudicated bid.

*Pls.' Exh. 8.* Defendant Calderón forwarded the report to the Secretary of Justice, and the Secretary of Justice then referred the matter to the Special Independent Prosecutor. The Secretary of Justice had been apprised of the Commission's investigation into the PRIME matter since August, and the Commission had been working in close collaboration with the Department of Justice.

On November 1, 2001, the Commission submitted the second part of its report on the PRIME matter to Defendant Calderón. The Commissioners have given a presentation about the report to the Governor, but as of November 8, 2001, she had not read the document. On November 4, 2001, the Puerto Rico Department of Justice referred the matter to a Special Independent Prosecutor for further proceedings. *Docket Document No. 39. See* Part

**5.** This is the evidence which the court examined *in camera* and which Plaintiffs have never seen. Although we examined thirteen boxes of material, only the formal exhibits to the official reports, copies of the sworn statements, and reports of interview have been marked as Court Exhibits 4–1, 4–2, 4–3 (Barbosa 306 transaction), and Court Exhibits 8–1 and 8–2 (PRIME Report, Part II, and sworn statements and reports of interview).

II of the PRIME Report, *Court Exh. 8–1.* On November 26, 2001, EL NUEVO DÍA, a local newspaper, published the results of Part II of the PRIME report. The court is not aware whether plaintiffs received a copy.

## IV.

### *Procedural History*

On July 16, 2001, Plaintiffs filed the present complaint. *Docket Document No. 1.* While the complaint is somewhat tenebrous, we can discern that Plaintiffs are alleging violations of their First Amendment, equal protection, and due process rights guaranteed by the United States Constitution. U.S. CONST. amends. I, V, XIV. Plaintiffs also allege violations of Article II, Sections 1, 6, 7, and 8 of the Constitution of the Commonwealth of Puerto Rico, P.R. CONST. art. II, §§ 1, 6, 7, 8, and 31 L.P.R.A. § 5141 (1990). Plaintiffs aver that the Commission is invalid because it violates the principle of separation of powers enshrined in the Puerto Rico Constitution. Plaintiffs claim that this court has subject matter jurisdiction over their state-law claims pursuant to 28 U.S.C. § 1367 (1993).

Plaintiffs Aponte and Pagán each seek compensatory damages for violations of their federal constitutional rights and for Defendants' alleged tort-law violations. Plaintiffs allege that they have suffered great mental and emotional anguish due to the harm inflicted upon their personal and professional reputation. Plaintiffs maintain that Defendants' actions have prevented them from obtaining employment in the public and private sectors. In addition, Plaintiffs claim to have experienced tremendous fear and anxiety due to the possibility that frivolous criminal charges will be brought against them. Furthermore, Plaintiffs demand punitive damages.

Plaintiffs also seek a declaratory judgment stating that the Commission violates the United States Constitution and the Constitution and laws of Puerto Rico. Plaintiffs also request injunctive relief barring Defendants from violating Plaintiffs' constitutional rights and ordering Defendant Calderón to vacate Executive Order No.2001–06 and to permanently dissolve the Commission.

On August 13, 2001, Plaintiff Pagán filed a motion for a preliminary injunction. *Docket Document No. 7.* Plaintiff Pagán requests that this court bar Defendants from further harassing him with respect to their investigation on the remodeling of the Barbosa building and on the contract between PRIME and the Solid Waste Authority. Defendants oppose Plaintiff Pagán's motion for a preliminary injunction. *Docket Document Nos. 12, 16, 22, 23.*

On September 4, 2001, Defendants Noriega–Rodríguez, Colón–Carlo, Vélez–Borrás, Galarza, López–Oliver, and Hermida ("Defendant Commissioners") filed a Rule 12(b)(6) motion to dismiss on the following grounds: (1) Plaintiffs' procedural due process claims fail because they have not identified a constitutionally protected liberty or property interest; (2) even if Plaintiffs' procedural due process rights were violated, such deprivations were "random and unauthorized," and Plaintiffs have failed to allege the unavailability of an adequate post-deprivation state-law remedy; (3) Plaintiffs' claims of denial of their right to a fair trial, the presumption of innocence, and effective assistance of counsel are not ripe; (4) defamation is not a constitutional cause of action; (5) Plaintiffs' conclusory allegations with regard to political discrimination are insufficient to state an equal protection or First Amendment claim; (6) Defendant Commissioners are protected by the doctrine of qualified immunity; and (7) this court should de-

cline to exercise supplemental jurisdiction over Plaintiffs' state-law claims.[6] *Docket Document No. 13.* Defendant Calderón joins Defendant Commissioners' motion to dismiss. *Docket Document No. 16.*

On September 5, 2001, Plaintiff Pagán filed a motion to supplement his preliminary injunction motion. *Docket Document No. 15.* Plaintiff Pagán contends that this court should rely on *Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), to find that Plaintiffs have prevailed on the merits. Defendants filed a supplementary motion of law arguing that *Jenkins* does not apply to the instant case. *Docket Document Nos. 23, 25.*

On September 13, 2001, Plaintiffs filed a motion for partial summary judgment. *Docket Document No. 21.* Plaintiffs asseverate that they are entitled to judgment as a matter of law with regard to their First Amendment, equal protection, and due process claims. Plaintiffs' lengthy brief, which largely reiterates previous filings, does not present any new arguments for this court to consider. Defendants oppose Plaintiffs' summary judgment motion. *Docket Document Nos. 31, 32.*

On September 17, 2001, Defendant Calderón filed a Rule 12(b)(6) motion to dismiss the complaint against her on the following grounds: (1) the allegations of the complaint are insufficient to state a claim of defamation; (2) injury to one's reputation is only actionable under Section 1983 if the harm to reputation is accompanied by the loss of a current governmental entitlement; (3) the superfluous nature of the Blue Ribbon Commission is not a matter that this court should concern itself with; (4) *Jenkins* is not controlling; and (5) Defendant Calderón is entitled to absolute and/or qualified immunity. *Docket Document No. 25.*

On September 28, 2001, Plaintiffs filed a consolidated opposition to Defendants' motions to dismiss. *Docket Document No. 30.*

On November 1, 2001, Plaintiff Pagán filed a motion for a temporary restraining order prohibiting Defendants from making further statements regarding the PRIME report. *Docket Document No. 36.* The court denied the request without prejudice due to the proximity of a scheduled hearing.

On November 6–8, 2001, this court held an injunctive relief hearing.[7]

## V.

### *Analysis*

We assess the relevant arguments presented in the parties' various dispositive

---

**6.** Because Defendant Commissioners' brief is imprecisely drawn, at the outset it is unclear whether this court should treat the motion as a Rule 12(b)(6) motion or as a Rule 56 motion. The brief is titled "Motion to Dismiss and/or [for] Summary Judgment," and Defendant Commissioners state therein that this court may choose to apply either the Rule 12(b)(6) or the Rule 56 standard in disposing of the motion. Defendant Commissioners have attached a statement of facts not in controversy as well as two exhibits, an affidavit signed by León–Suárez and a copy of the Barbosa 306 report. We decide to treat the motion as one brought pursuant to Rule 12(b)(6).

**7.** The parties had cluttered the record with many nebulous memoranda raising a multitude of issues, some of which were of questionable relevance and merit. On October 16, 2001, this court issued an Order clarifying the issues that warranted attention. *Docket Document No. 35.* We warned the parties that the injunctive relief hearing scheduled for November 6, 2001, could be consolidated with a trial on the merits in accordance with Federal Rule of Civil Procedure 65(a)(2). FED. R. CIV. P. 65(a)(2). At the conclusion of the hearing, the parties agreed that they did not have any further evidence to present, so we consolidated the injunctive relief hearing with the trial on the merits.

motions, along with Plaintiffs' requests for injunctive and declaratory relief.

## A. *Ripeness*

■ We first consider whether this case is justiciable. The purpose of the ripeness doctrine is " 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' " *Stern v. United States Dist. Court for the Dist. of Mass.*, 214 F.3d 4, 10 (1st Cir.2000) (internal citation omitted). The "linchpin of ripeness ... is adverseness." *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 692 (1st Cir.1994).

■ We find that Plaintiffs have a genuine threat of prosecution for the various criminal offenses outlined *infra*. The close collaboration between the Blue Ribbon Commission and law enforcement agencies, along with the public accusations of criminal misconduct against Plaintiffs, evidence the likelihood that Plaintiffs may be prosecuted for violations of Puerto Rico's Penal Code. Consequently, we find that the present case is ripe for adjudication. *See R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir.1999) (" 'Our conclusion that a reasonable threat of prosecution exists ... effectively dispenses with any ripeness problem.' ") (internal citation omitted).

## B. *Younger Abstention*

■ In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that federal courts are obligated to abstain from adjudicating federal claims if such adjudication would involve needless interference into state court criminal proceedings. *Id.* at 44, 91 S.Ct. 746. Pursuant to *Younger*, a federal court should abstain from deciding the merits of a case if

[t]here is (1) an ongoing state judicial proceeding, instituted prior to the federal proceeding (or, at least, instituted prior to any substantial progress in the federal proceeding), that (2) implicates an important state interest, and (3) provides an adequate opportunity for the plaintiff to raise the claims advanced in his federal lawsuit.

*Brooks v. N.H. Supreme Court*, 80 F.3d 633, 638 (1st Cir.1996). In certain circumstances, a federal court may be obligated to abstain from adjudicating a federal case to prevent interference with ongoing state administrative proceedings. *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986).

■ We find that the principles of *Younger* do not apply to the present case. First, there are no ongoing state criminal proceedings pending against Plaintiffs. Although the transactions investigated by the Blue Ribbon Commission have been referred to the Department of Justice, there have been no formal criminal charges filed against them. Second, there appears to be no ongoing state administrative proceeding involving Plaintiffs. The Commission's investigation of the Barbosa 306 transaction concluded in the spring of this year, and the report was released to the public on May 9, 2001. The Commission's investigation of the PRIME matter has also terminated, and the Commission forwarded the second and final part of its report to Defendant Calderón on November 1, 2001. Since there appears to be no ongoing state criminal or administrative proceedings involving Plaintiffs, we reject Defendants' contention that this court should abstain from deciding this case pursuant to *Younger*.

## C. *Absolute Immunity*

■ Public officials acting in a legislative capacity enjoy absolute immunity from

liability under Section 1983. *Romero–Barcelo v. Hernandez–Agosto,* 75 F.3d 23, 28 (1st Cir.1996). The question of whether an official can properly invoke absolute immunity hinges on the function performed by that individual, not on his or her official title. *Acevedo–Garcia v. Vera–Monroig,* 204 F.3d 1, 8 (1st Cir.2000). An official is protected by absolute immunity in the performance of legislative acts only; absolute immunity does not shield an official from liability for administrative or executive acts. *Id.* at 7–8.

The test to determine whether an act is legislative or administrative is two-pronged.

> First, if the facts underlying the decision are 'generalizations concerning a policy or state of affairs,' the decision is legislative. If the decision stems from specific facts relating to particular individuals or situations, the act is administrative. Second, the court must consider 'the particularity of the impact of the state of action.' 'If the action involves establishment of a general policy, it is legislative;' if it 'single[s] out specifiable individuals and affect[s] them differently from others,' it is administrative.

*Id.* at 9.

Here, it appears that Defendant Calderón was inspired to create the Blue Ribbon Commission out of concern about purported corruption within a particular New Progressive Party administration. Defendant Calderón's promulgation of Executive Order 2001–06, receipt of investigative reports from the Blue Ribbon Commission, referral of matters to the Department of Justice, and staging of news conferences disclosing the findings of the Commission apparently stemmed from specific facts relating to the Rosselló administration. Even if this were not the

case and Defendant Calderón's actions were motivated by a general, abstract policy against corruption, we note that Defendants' implementation of the executive order has unquestionably targeted particular individuals. *Cf. Acevedo–Garcia,* 204 F.3d at 8–9. The investigations carried out by the Blue Ribbon Commission and the subsequent public accusations of misconduct unquestionably single out specific individuals, including Plaintiffs, and have profoundly and uniquely impacted their lives. We conclude that the creation and operation of the Blue Ribbon Commission is an administrative, not a legislative act, and that therefore Defendant Calderón is not entitled to absolute immunity.

### D. *Injunctive Relief*

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, we consolidated the injunctive relief hearing with the trial on the merits, and we determine whether Plaintiffs are entitled to permanent injunctive relief. FED. R. CIV. P. 65(a)(2).

To issue a permanent injunction, a district court must make the following findings: "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *A.W. Chesterton Co. v. Chesterton,* 128 F.3d 1, 5 (1st Cir. 1997).

#### 1. *Success on the Merits*

To prevail on a Section 1983 claim, a plaintiff must make two showings: " '(i) that the conduct complained of has been committed under color of state law,[8] and

---

8. Defendants have not argued that they were

private actors in the context of the present

(ii) that this conduct worked a denial of rights secured by the Constitution or laws of the United States.'" *Collins v. Nuzzo,* 244 F.3d 246, 250 (1st Cir.2001).

### a. *First Amendment*

Plaintiffs argue that their constitutional rights to freedom of speech and of association have been violated by the actions of the Commission. According to Plaintiffs, Defendants invidiously discriminated against Plaintiffs due to their political affiliation, in violation of the First Amendment. Plaintiffs claim that the Blue Ribbon Commission is an instrument used by the Popular Democratic Party ("PDP") to persecute persons who advocate statehood for Puerto Rico. Plaintiffs allege that the following facts evidence Defendants' discriminatory animus against Plaintiffs on the basis of their affiliation with the New Progressive Party ("NPP"): (1) Defendant Calderón has made numerous public statements about the allegedly widespread corruption within the Rosselló administration; (2) none of the members of the Commission are affiliated with the New Progressive Party; (3) several Commissioners have had ties with PDP administrations and Defendant Noriega–Rodríguez ran for governor on the Puerto Rican Independence Party ticket; (4) the Commission is purportedly focused only on questionable transactions of the Rosselló administration; (5) other government institutions, such as the Office of the Comptroller, the Department of Justice, and the Office of the Special Independent Prosecutor fulfill similar functions as the Commission, and, therefore, the Commission is superfluous; (6) Defendant Calderón's process of selecting Commissioners is subjective and arbitrary; (7) Defendant Commissioners serve

at the pleasure of Defendant Calderón and therefore lack independence from her; and (8) Executive Order 2001–06 and the Commission's internal regulations lack guidelines as to how the Commission should select transactions to investigate and how the Commission should conduct its investigations so as to protect the constitutional rights of persons under scrutiny.

The First Amendment reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The primary purpose of the First Amendment is to protect political expression. 4 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 20.50 (3d ed.1999).

The First Circuit has not developed a general standard for courts to evaluate all types of alleged First Amendment violations in Section 1983 cases. *See Romero Barcelo v. Hernandez Agosto,* 876 F.Supp. 1332, 1347 (D.P.R.1995), *aff'd,* 75 F.3d 23 (1st Cir.1996). The courts have held that the First Amendment prohibits certain types of government action which limit individuals' freedom to speak and to participate in political activities. For example, the First Circuit has ruled that non-policymaking public employees may not be terminated because of their political views. *See, e.g., Padilla–Garcia v. Guillermo Rodriguez,* 212 F.3d 69, 74 (1st Cir.2000). Public employees may also sustain a Section 1983 First Amendment claim on the basis of an adverse employment action tak-

---

case. We find that Plaintiffs have made the showing of public action necessary to invoke the protections of the United States Constitution. For an illustrative discussion of the

public/private dichotomy and the state action requirement, see *Perkins v. Londonderry Basketball Club,* 196 F.3d 13 (1st Cir.1999).

en against them in relation to speech regarding public matters. *Tang v. State of R.I., Dep't of Elderly Affairs*, 163 F.3d 7, 11–12 (1st Cir.1998). The First Circuit has not, however, formulated a general standard to be applied in First Amendment cases that do not arise in particular contexts such as these.

■■■ The crux of Plaintiffs' First Amendment claim is that Plaintiffs are associated with the New Progressive Party, while Defendants are not. Plaintiffs conclude that the actions taken by Defendants constitute a violation of Plaintiffs' First Amendment right to associate with the political party of their choosing. We find that Plaintiffs have not prevailed on the merits of their First Amendment claim. The bare fact that Defendants are not openly identified with Plaintiffs' party of choice, the New Progressive Party, clearly does not rise to the level of a First Amendment violation. *See Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 58 (1st Cir.1990) ("Merely juxtaposing a protected characteristic-someone else's politics-with the fact that plaintiff was treated unfairly is not enough to state a constitutional claim."). If this court were to conclude otherwise, every disgruntled individual who had been subjected to any kind of undesired treatment by a state actor affiliated with a rival political group would be able to seek relief in federal court for infringements upon his or her First Amendment rights. Despite Plaintiffs' protestations to the contrary, the Constitution does not afford such sweeping protections.

### b. *Equal Protection*

■■■ In addition to their First Amendment and due process claims, Plaintiffs have alleged a violation of the equal protection clause of the Fourteenth Amendment. Since the class allegedly suffering discrimination consists of persons belonging to a particular political party, we find that the so-called equal protection claim is nothing more than a restatement of Plaintiffs' First Amendment claim. Viewing it as such, and concluding that Plaintiffs cannot, by pleading equal protection, outdistance the constitutional protection afforded by the First Amendment, we dismiss Plaintiffs' equal protection claims. *See* 3 ROTUNDA & NOWAK, § 18.40 ("It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights.").

### c. *Procedural Due Process*

Under the Fourteenth Amendment to the Constitution, no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. IV, § 1. The essential inquiry under the due process clause is whether Plaintiffs were treated fairly. 3 ROTUNDA & NOWAK, § 17.8. The Constitution demands that the state cannot deprive an individual of a significant interest in liberty or property without first warning the individual and providing "an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir.1990) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).

■■■ To establish a procedural due process claim, a plaintiff must show that (1) he has a constitutionally protected interest in life, liberty, or property, and (2) the state deprived him of that interest without due process of law. *See Romero–Barcelo*, 75 F.3d at 32; *PFZ Props., Inc. v. Rodriguez*, 928 F.2d 28, 30 (1st Cir.1991).

Plaintiffs argue that they have a constitutionally protected property and liberty interest in their good name. Plaintiffs Pagán and Aponte both testified that Defendants' conduct has caused serious injury to their professional reputations. Plaintiffs claim that their careers have suffered greatly as a result of the Commission's issuance of reports accusing them of criminal activity. Plaintiffs also maintain that they were denied their constitutional right to a fair trial in which defendants are to be presumed innocent and to be assisted by counsel.

An individual's interest in his reputation is constitutionally protected only if the interest is

> [a]ccompanied by a change in the [victim's] status or rights (under substantive state or federal law), perhaps as a touchstone (or concrete evidence) of the fact that the injury to reputation was inflicted as a result of a conscious government policy and is serious enough to interfere with other liberties of the sort suggested in *Meyer [v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) ].

*Beitzell v. Jeffrey*, 643 F.2d 870, 878 (1st Cir.1981).

The Constitution of the Commonwealth of Puerto Rico protects an individual from attacks on his reputation. P.R. CONST. art. II, § 8 ("Every person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life."). The First Circuit has found that Section 8 may create a constitutionally protected liberty interest in one's reputation. *Romero–Barcelo*, 75 F.3d at 33. An individual does not enjoy a constitutionally protected interest in his own reputation unless the harm to his reputation is "unusually serious." *Beitzell*, 643 F.2d at 878.

This court need not decide whether Plaintiffs' interest in their reputation rises to a constitutionally protected level in the case at bar, because we find that Plaintiffs have a fundamental, constitutionally protected liberty interest in being free from investigation and prosecution for criminal offenses in a manner that tramples upon the procedural protections afforded by the Fourteenth Amendment. *See, e.g., Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (explicated *infra* ); *Gabrilowitz v. Newman*, 582 F.2d 100, 107 (1st Cir.1978) (student had a due process right to counsel at a college disciplinary hearing due to the pending criminal case against him); *Watson v. County of Riverside*, 976 F.Supp. 951, 956 (C.D.Ca.1997) (due in part to the possibility of criminal prosecution, police officer had a due process interest in being represented by counsel in relation to the drafting of a report about an incident of police brutality). The due process clause requires the imposition of numerous procedural safeguards at every stage of the criminal investigatory and adjudicatory process for the protection of individuals. *See* 1 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 2.7(a) (2d ed.1999). The liberty interest protected by the due process clause plainly includes liberty from unjust imprisonment. *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (liberty "denotes not merely freedom from bodily restraint"). Although they have not yet been formally charged, Plaintiffs have been accused of serious violations of the Puerto Rico criminal code, and they have a protected interest in being free from prosecution in a manner that does not uphold constitutional requisites of due process.

The May 1, 2001 Commission report included the following conclusion:

> The data compiled by the Commission in this case clearly revealed that both CPA Jorge Aponte, then Director of the OGP,

and engineer Daniel Pagán, then Secretary of the DRNA, at the very least were grossly negligent in assigning the function of negotiating a multi-million-dollar transaction to certain subordinate functionaries who, in the Commission's judgment, lacked the necessary capability to handle a matter of such magnitude. Those data further reveal that both Messrs. Aponte and Pagán at the very least were repeatedly and grossly negligent in failing to adequately supervise the dealings that their aforesaid subordinates were making in the aforesaid transaction.

*Pls.' Exh. 4.* At a bare minimum, the report clearly accuses Plaintiffs of violating Section 4366 of the Puerto Rico Penal Code:

> Every public officer who wilfully neglects to perform the duties of his office or employment, or who violates any legal provision relative to his duties or those of his office or employment, for which no special provision fixing the corresponding penalty is prescribed, shall be punishable by imprisonment not exceeding six months or a fine not exceeding five hundred dollars, or both, in the discretion of the court.

33 L.P.R.A. § 4366 (1983). In addition, Plaintiffs are at risk of prosecution for committing crimes against public funds in violation of Section 4391.

> Any public official or employee and any person in charge of receiving, keeping, transferring or reimbursing public funds who performs any of the following acts shall be punished with imprisonment for a fixed term of six (6) years:
>
> . . . .
>
> (k) Neglects or fails to safekeep or disburse public funds as prescribed by law.

33 L.P.R.A. § 4391 (1983 & Supp. I 1998).

The PRIME report released on October 31, 2001, contained the following conclusion accusing Plaintiff Pagán of criminal conduct:

> Then-secretary of the DRNA, Engineer Daniel Pagán Rosa, improperly intervened in the stage of reconsideration of the awarding of a bid procedure to the ADS for a project for the recovery of clean material at the municipality of Toa Baja in particular. And after the bid board of the ADS had adjudicated said bid and they had reaffirmed their decision to deny a motion for reconsideration, Engineer Pagán Rosa ordered the president of the bid board to cause the disappearance of the documents which evidenced this last decision of the board, and in its place the board should annul the previously adjudicated bid.

*Pls.' Exh. 8.* The Commission concluded that Plaintiff Pagán had committed undue intervention in the performance of contracts, bidding procedures or government operations in violation of Section 4353a of the Penal Code:

> Every public official or employee who, without legal authority, intervenes unduly in the performance of a contract, bidding procedure or any other operation of the Government of the Commonwealth of Puerto Rico by willfully omitting or committing any act that constitutes an unequivocal violation of the laws, regulations and norms applicable to these transactions with the sole purpose of benefiting a particular person, shall be punished by imprisonment for a fixed term of three (3) years. In the event of aggravating circumstances, the established fixed term shall be increased up to a maximum of five (5) years; if there were extenuating circumstances, it shall be reduced to a minimum of two (2) years.

33 L.P.R.A. § 4353a (1983 & Supp. I 1998). In addition, Plaintiff Pagán may be prose-

cuted for committing destruction or mutilation of documents in violation of Section 4356 of the Penal Code:

> Every public officer or employee in charge of the custody of any original public document ... who willfully takes, destroys, removes or conceals in whole or in part, or who permits another person to do so, shall be punishable by imprisonment for a fixed term of six (6) years. If there were aggravating circumstances, the fixed penalty established may be increased up to a maximum of ten (10) years; if there were extenuating circumstances it could be reduced to a minimum of four (4) years.

33 L.P.R.A. § 4356 (1983 & Supp. I 1998).

Given the likelihood that serious criminal charges will be brought against Plaintiffs as a result of the Commission's investigations, it is pellucid that Plaintiffs have a constitutionally protected liberty interest in ensuring that the state acts in accordance with due process standards in the prosecution of Plaintiffs.

The requirements of procedural due process are flexible and depend on the specific situation at issue. *Amsden*, 904 F.2d at 753. The United States Supreme Court enunciated the factors that must be balanced in a procedural due process analysis in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safe-

guards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Id.* at 334–35, 96 S.Ct. 893. When the government deprives an individual of an interest in life, liberty, or property, the elements of due process which may be required are:

> (1) adequate notice of the charges or basis for government action; (2) a neutral decision-maker; (3) an opportunity to make an oral presentation to the decision-maker; (4) an opportunity to present evidence or witnesses to the decision-maker; (5) a chance to confront and cross-examine witnesses or evidence to be used against the individual; (6) the right to have an attorney present the individual's case to the decision-maker; [and] (7) a decision based on the record with a statement of reasons for the decision.

3 ROTUNDA & NOWAK, § 17.8. Furthermore, in the context of criminal proceedings or other formal adjudicative processes, the following elements may be required: "(1) the right to compulsory process of witnesses; (2) a right to pre-trial discovery of evidence; (3) a public hearing; (4) a transcript of the proceedings; (5) a jury trial; [and] (6) a burden of proof on the government greater than a preponderance of the evidence standard." [9] *Id.*

In *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), the United States Supreme Court examined the constitutionality of a Louisiana statute which created a Labor–Manage-

---

**9.** In addition, under certain circumstances, a person suspected of having committed a crime has the right to be advised of his or her constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *Miranda* rules are

"not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

ment Commission of Inquiry. The purpose of the commission was to investigate facts relating to violations of criminal laws in the area of labor-management relations. The Supreme Court reversed the dismissal of the case by the lower court.

The Louisiana commission was created to supplement the efforts of law enforcement agencies in the investigation of violations of criminal laws. Upon referral by the governor, the commission could hold a public hearing to determine the facts relating to alleged criminal activity. The commission was empowered to adopt its own rules and regulations, to employ investigative, legal, and other staff members, to require the attendance of witnesses, and to compel the production of documentary evidence. The commission could enforce its orders through contempt proceedings in state courts.

In *Jenkins,* the commission made public findings as to whether probable cause existed that a crime had occurred. The Louisiana commission did not have the authority to render adjudications that were binding on any persons; it could only make conclusions as to whether particular individuals had participated in criminal activity and offer recommendations to the governor for further proceedings.

If the commission found probable cause, it was required to report its conclusions to the relevant state or federal authorities. The commission also had authority to file charges. In addition, the commission could ask the governor to refer matters to the state attorney general for prosecution.

Witnesses called to testify before the Louisiana commission were apprised of the general subject of investigation prior to the hearing. Witnesses had the right to the services of an attorney, although the commission could impose limitations on counsel's participation in the hearing to prevent interference with the proceedings.

The attorney could question his own client, but the witness and his counsel had only a limited right to examine other witnesses. Witnesses could request that particular questions be asked of other witnesses, but the commission had final authority to decide which questions to ask the individuals who appeared before it.

Although the Louisiana commission generally presided over public hearings, it could meet in executive session if it appeared that a witness' testimony would "tend to degrade, defame or incriminate any person." In executive session, the commission was required to allow the individual who might be presented in a negative light the opportunity to testify on his own behalf and to present witnesses in his defense.

The *Jenkins* Court noted that the commission did not function in an adjudicative capacity in the same manner as a court. 395 U.S. at 427, 89 S.Ct. 1843. However, the Court found that the findings prepared by the commission were very similar to an official adjudication of criminal culpability by a court of law. *Id.*

The Court found that the procedural protections offered by the Louisiana commission did not meet the standards imposed on the states pursuant to the due process clause of the Fourteenth Amendment. *Id.* at 428, 89 S.Ct. 1843. ("[I]t is clear the procedures of the Commission do not meet the minimal requirements made obligatory on the States by the Due Process Clause of the Fourteenth Amendment."). The Court stressed that the right to confront and cross-examine witnesses is an essential component of due process. *Id.* Since the commission made actual determinations that particular individuals were guilty of committing a crime, the Court found that the commission's restrictions on witnesses' right to confront and

cross-examine witnesses was unconstitutional. *Id.* at 429, 89 S.Ct. 1843. ("[W]e think that due process requires the Commission to afford a person being investigated the right to confront and cross-examine the witnesses against him, subject only to traditional limitations on those rights.").

In addition, the *Jenkins* Court emphasized that the right to present evidence on one's behalf is a fundamental element of procedural due process. *Id.* When the commission met in executive session, a person who was being investigated could call a "reasonable number of witnesses" to testify, but if the commission held a public hearing, the individual could only present his own testimony and the "pertinent" written declarations of other witnesses. In a public hearing, the commission could deny an individual the right to proffer oral testimony of other witnesses, and the commission could refuse to subpoena witnesses an individual might wish to testify. The Court concluded that the commission should not impose such restrictions on a person's ability to present his version of the facts.

The Blue Ribbon Commission shares many key similarities with the Louisiana Labor–Management Commission of Inquiry. The Blue Ribbon Commission is involved in investigating criminal activity and making findings that specific individuals engaged in criminal conduct. Like the Louisiana commission, the Blue Ribbon Commission supplements the efforts of other law enforcement agencies in the investigation of criminal violations. The Blue Ribbon Commission has the power to adopt its own bylaws, to employ investigative and other staff members, to coerce the attendance of witnesses, and to compel the production of documentary evidence.

The Blue Ribbon Commission, like the Louisiana commission, does not function in an adjudicative capacity in the same manner that a court does. The Louisiana commission did not have the power to render adjudications that were binding on any persons; it could only make recommendations to the governor for him or her to take further action to prosecute named persons. Likewise, the reports issued by the Blue Ribbon Commission are not obligatory, and the Commission can only offer recommendations that Defendant Calderón refer a particular matter to the Department of Justice for prosecution.

The *Jenkins* Court concluded that the findings prepared by the Louisiana commission were very much like an official adjudication of criminal culpability by a court of law. *Id.* at 427, 89 S.Ct. 1843. Likewise, we find that the reports submitted by the Blue Ribbon Commission to Defendant Calderón are very similar to an official determination of guilt by a legal tribunal. The Blue Ribbon Commission uses its broad powers to collect testimonial and documentary evidence that named individuals committed criminal offenses, and it then makes findings that those individuals were guilty of criminal activity. We find that *Jenkins* governs the present case.

Defendants have attempted to distinguish *Jenkins* from the case at bar. Defendants argue that the main opinion in *Jenkins* carries limited weight, because it is only a plurality opinion. Defendants also emphasize that the Court only held that the plaintiff had alleged a cause of action, not that he had prevailed on his constitutional claim. Defendants argue that *Jenkins* does not apply here because of the following alleged characteristics of the Blue Ribbon Commission, which were not shared by the Louisiana commission: (1) the Blue Ribbon Commission is not responsible for law enforcement and may render recommendations for legislative or

other measures; (2) the Blue Ribbon Commission may act sua sponte and is independent from the Governor; (3) the Blue Ribbon Commission operates in strict confidentiality; (4) the Blue Ribbon Commission cannot issue subpoenas and cannot compel individuals to appear before it; (5) the Blue Ribbon Commission does not make findings of probable cause of criminal violations; (6) the Blue Ribbon Commission is not required to report its findings to law enforcement authorities and may only issue reports to the Governor; and (7) the Blue Ribbon Commission does not have the power to initiate criminal proceedings. Furthermore, Defendants argue that *Jenkins* does not apply, because the defendants therein had been accused of coercing government officials into filing false criminal charges and intimidating judicial officers. Defendants conclude that *Hannah v. Larche,* 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), controls.

This court is not persuaded by Defendants' arguments. We dispute several of Defendants' characterizations of the Blue Ribbon Commission. We find that the Blue Ribbon Commission serves "a function very much akin to making an official adjudication of criminal culpability." *See Jenkins,* 395 U.S. at 427, 89 S.Ct. 1843. The Commission makes actual findings that named individuals are guilty of criminal violations as part of a process of criminal prosecution. Therefore *Jenkins,* not *Hannah,* governs.

Furthermore, we are troubled by the secrecy surrounding the Blue Ribbon Commission's investigations. *See Hannah,* 363 U.S. at 496, 80 S.Ct. 1502 (Douglas, J., dissenting). The veil of secrecy shrouding the Commission's hearings increases the probability that abuses might take place behind closed doors.

This court finds that the procedures employed by the Blue Ribbon Commission are far less protective of Plaintiffs' procedural rights compared with those applied by the Louisiana Labor–Management Commission of Inquiry that were analyzed by the Supreme Court in *Jenkins.*

The *Jenkins* Court found that the Louisiana commission's restrictions on individuals' right to confront and cross-examine witnesses were unconstitutional. *Id.* at 428, 89 S.Ct. 1843. The Louisiana commission allowed individuals under investigation only a limited opportunity to examine other witnesses. An individual testifying before the commission could ask that particular questions be asked of other witnesses, but only those questions approved by the commission would be submitted to the witnesses who testified before it.

In the present case, individuals who are being investigated by the Blue Ribbon Commission have no right to confront and cross-examine witnesses testifying against them. Persons who are under scrutiny by the Commission are not even informed of the names of the individuals offering evidence against them. As the Supreme Court noted in *Jenkins,* the right to confront and cross-examine witnesses is one of the most fundamental elements of due process. *Id.* Persons investigated by the Blue Ribbon Commission have no opportunity to examine witnesses offering testimony that they have engaged in criminal conduct.

Furthermore, the *Jenkins* Court found that the Louisiana commission's restrictions on an individual's ability to present evidence on his own behalf were of questionable constitutionality. *Id.* at 429, 89 S.Ct. 1843. ("[A] person's right to present his case should not be left to the unfettered discretion of the Commission."). When the Louisiana commission met in executive session, a person being investigated could present testimony from a "reasonable number of witnesses." When the

commission held public hearings, an individual under investigation could only offer his own testimony and the "pertinent" written statements of other witnesses. When it met in public hearings, the Louisiana commission could prevent a person under investigation from presenting the oral testimony of other witnesses in his defense.

Here, the procedural regulations of the Blue Ribbon Commission do not offer individuals under investigation any opportunity to produce other witnesses to testify on their behalf. The right to present witnesses on one's behalf is a critical component of due process, *see id.*, and Plaintiffs were not afforded any opportunity to do so.

We apply the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The private interest affected by the official action, Plaintiffs' interest in being free from investigation and prosecution for criminal violations in an unconstitutional manner, is obviously a vital interest, considering that Plaintiffs risk facing substantial terms of imprisonment. The current procedure employed by the Commission entails a substantial risk that Plaintiffs will be wrongly deprived of their liberty interest. The use of additional procedural safeguards would be highly valuable in securing compliance with the Fourteenth Amendment. If an individual being investigated by the Blue Ribbon Commission was provided a meaningful opportunity to present documentary and testimonial evidence to a neutral decision-maker and to confront and cross-examine witnesses offered against him or her, such measures would help ensure that Defendants comply with due process. *See*

3 ROTUNDA & NOWAK, § 17.8. The state's burden in allowing such safeguards would be moderate in comparison with the grave liberty interests at stake.

In conclusion, we find that Defendants' treatment of Plaintiffs in the context of the Commission's investigations did not comport with the constitutional requirement of fundamental fairness.[10] Plaintiffs were not afforded "an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir.1990). We conclude that Plaintiffs have prevailed on the merits of their procedural due process claim.

■ Defendants argue that Plaintiffs have adequate post-deprivation state-law remedies for the violations of their procedural due process rights. We disagree. "A procedural due process claim is not actionable unless, *inter alia,* no adequate 'post-deprivation remedy' is available under state law." *Perez–Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir.1994).

In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law* .... The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safe-

---

**10.** Nothing in our present ruling affects the procedures employed by grand juries in their investigations of criminal activity. See *Hannah,* 363 U.S. at 497–508, 80 S.Ct. 1502

(Douglas J., dissenting), for a discussion of the unique historical role of grand juries in our criminal justice system.

guards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

*Zinermon v. Burch,* 494 U.S. 113, 125–26, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Since we have already examined the procedures used by the Commission and found them wanting, we turn to the state-law remedies available to Plaintiffs. Since Defendants have not specified which state-law post-deprivation causes of action allegedly provide adequate remedies to Plaintiffs, we are left to use our imaginations.

▮ Plaintiffs may be able to frame their local law compensatory damages claim as one for defamation.[11] Since Plaintiffs were high-level officials in the Rosselló administration, they would qualify as public figures. *Pages v. Feingold,* 928 F.Supp. 148, 154 (D.P.R.1996). To prevail on a defamation claim, a public figure must demonstrate by clear and convincing evidence that "a falsehood [was] published with 'actual malice' by the defendant (meaning a knowing falsehood or one made recklessly)." *Emerito Estrada Rivera–Isuzu de P.R., Inc. v. Consumers Union of United States, Inc.,* 233 F.3d 24, 27 (1st Cir.2000). We find that the barriers to relief through a lawsuit for defamation are so high as to constitute an inadequate remedy for the deprivation of Plaintiffs' procedural rights.

▮ Puerto Rico tort law provides a cause of action for malicious prosecution. To state a cause of action, a plaintiff must demonstrate that "(1) the criminal action was initiated and instigated by the defendant; (2) the criminal action terminated in favor of the plaintiff; (3) the defendant

initiated the action with malice and without probable cause; and (4) as a consequence, the plaintiff suffered damages." *Negron–Rivera v. Rivera–Claudio,* 204 F.3d 287, 290 (1st Cir.2000). We conclude that an action for malicious prosecution would provide an inadequate post-deprivation remedy to Plaintiffs. Most importantly, Plaintiffs would have to be prosecuted and then acquitted in state court. Since formal charges have not been filed against Plaintiffs, it is questionable, at best, whether Plaintiffs would be able to avail themselves of an action for malicious prosecution.

### 2. *Irreparable Injury*

▮ To award equitable relief, this court must conclude that Plaintiffs would suffer an irreparable injury in the absence of an injunction. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed.1995). "The threat of prosecution under the penal provisions of the pertinent laws establishes the threat of irreparable injury required by traditional doctrines of equity." *Glenwal Dev. Corp. v. Schmidt,* 336 F.Supp. 1079, 1083 (D.P.R.1972). Since Plaintiffs are at risk of criminal prosecution as a result of Defendants' conduct, we find that they have met the requirement of irreparable injury necessary for injunctive relief.

### 3. *Balance of Equities*

▮ To award a permanent injunction, a court must find that "the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of

---

**11.** In their complaint, Plaintiffs seek compensatory damages for Defendants' alleged violation of 31 L.P.R.A. § 5141. It is unclear from the pleadings whether Plaintiffs' claim is one for defamation or another tort.

an injunction." *A.W. Chesterton Co.*, 128 F.3d at 5.

As discussed above, Plaintiffs would suffer serious injury if this court did not impose an injunction upon Defendants. Defendant Commissioners have already accused Plaintiffs of committing negligence in the performance of their public duties in connection with the Barbosa 306 transaction, and they are subject to imprisonment for a term of up to six years pursuant to 33 L.P.R.A. § 4366 and 33 L.P.R.A. § 4391. Furthermore, the PRIME report charges Plaintiff Pagán of having committed undue intervention in the performance of contracts, bidding procedures, or government operations in violation of 33 L.P.R.A. § 4353a. That statute authorizes a term of imprisonment of up to five years. Plaintiff Pagán may also be prosecuted for destruction of public documents under 33 L.P.R.A. § 4356, and the penalty for that violation is four to ten years of imprisonment. Part II of ·the PRIME report, which was submitted to Defendant Calderón on November 1, 2001 and was released to the public while this case was sub judice, contains further findings of potential criminal conduct allegedly committed by Plaintiff Pagán that will cause him greater harm and an increased risk of prosecution.[12] The second part of the PRIME report also charges other government officers with criminal misconduct and extends its imputations of criminal activity to violations of the professional canons of ethics governing lawyers by the law firm of Can-cio, Nadal, Rivera, Díaz and Berríos, private attorneys retained by PRIME. The law firm has not been given an opportunity to defend itself against such serious accusations. *See Ct. Exh. 8–2 (Sworn Statement of Carlos Manuel Rivera Vicente, Esq.)*. The Commission may decide to initiate further investigations involving Plaintiffs. We find that any harm that would be suffered by Defendants due to the issuance of an injunction pales in comparison to the harm that would be experienced by Plaintiffs in the absence of an injunction. Therefore, we conclude that the balance of the equities weighs in favor of awarding injunctive relief.

### 4. *Public Interest*

■ This court must determine if the public interest would be harmed by the imposition of the injunctive relief requested by Plaintiffs. As the members of the Commission themselves have noted in their Barbosa 306 report, numerous government agencies, including the Comptroller's Office, the Government Ethics Office, the Department of Justice, the Special Independent Prosecutor's Office, the Office of Management and Budget, and the Legislative Assembly, are already involved with investigating corruption of government officials and promoting the efficient use of public funds. *Pls.' Exh. 4*. This court concludes that the public interest would not be harmed in any way from the imposition of an injunction against Defen-

---

**12.** Although the two known Blue Ribbon Commission investigations involving Plaintiffs have concluded and the findings have been submitted to the Governor and released to the public, we find that the present case is not moot for purposes of assessing Plaintiffs' request for injunctive relief. There is a reasonable expectation that Defendants would continue to violate individuals' constitutional rights, if this court did not issue an injunction, and Defendants' previous violations con-tinue to affect Plaintiffs. *See Metro–Goldwyn Mayer, Inc. v. 007 Safety Prods., Inc.*, 183 F.3d 10, 15 (1st Cir.1999). Defendants have not met the heavy burden of showing that their past violations of individuals' procedural rights probably would not recur. *See id.* There is nothing in the record to show that Defendant Commissioners are disinclined to perform their investigations in the same manner as they did previously.

dants, since there are already numerous existing organizations which perform the same function of investigating corruption. Furthermore, the public interest would likely be better served by an award of injunctive relief preventing Defendants from further abusing the due process rights of individuals, whether they be Plaintiffs or other persons similarly situated.

This court hereby grants Plaintiffs' request for a permanent injunction prohibiting Defendants from holding investigative hearings without affording individuals under investigation substantial opportunity to defend, among other rights, the right to present testimonial and documentary evidence on their behalf and to confront and cross-examine witnesses.

### E. *Declaratory Relief*

 Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 (1994), federal courts may enter a judgment declaring the rights of parties in relation to each other.[13] "In general, a party seeking declaratory relief must establish that the federal court has subject matter jurisdiction ... and the existence of an actual controversy." 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 57.09 (3d ed.2000). If these two requirements have been met, a federal court enjoys broad discretion in deciding whether to award a declaratory judgment. *See Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995); 12 MOORE ET AL., § 57.09. In deciding whether to grant declaratory relief, courts consider whether a declaratory judgment would further the interests of

the parties or the public, and whether such relief would clarify pending legal questions. *Metro. Prop. & Liab. Ins. Co. v. Kirkwood*, 729 F.2d 61, 62 (1st Cir.1984).

Plaintiffs request a declaratory judgment concluding that the Blue Ribbon Commission and Executive Order No.2001–06 are unconstitutional. We conclude that the public interest would be furthered by an award of declaratory relief. This court hereby declares that the procedures employed by the Blue Ribbon Commission in the investigation of public corruption are fundamentally unfair and contravene the requisites of the due process clause of the Fourteenth Amendment.

### F. *Qualified Immunity*

 Qualified immunity is an affirmative defense shielding public officials from civil damages so long as their conduct does not violate any clearly-established statutory or constitutional right of which a reasonable person would be aware. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 704 (1st Cir.1993). *See also Mitchell v. Forsyth*, 472 U.S. 511, 525–26, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In certain situations, private individuals such as Defendant Commissioners may also raise a defense of qualified immunity, because they perform the same function as public officials. *Frazier v. Bailey*, 957 F.2d 920, 928–29 (1st Cir.1992). The doctrine consists of two analytical prongs.

 First, the court must determine as a matter of law whether the constitutional right in question was clearly established at

**13.** The statute stipulates:
In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
28 U.S.C. § 2201(a).

the time of the alleged violation. *See Martinez v. Colon*, 54 F.3d 980, 988 (1st Cir. 1995). Second, the court must decide whether a reasonable, similarly situated official would understand that the challenged conduct violated the established constitutional right. *See Anderson v. Creighton*, 483 U.S. 635, 638–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Frazier*, 957 F.2d at 929. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034.

■ With regard to the first prong of the analysis, it has been clearly established that individuals have a right to be free from investigation, prosecution, and subsequent incarceration in a manner that tramples upon the procedural safeguards enshrined in the Constitution. There exist elaborate procedural mechanisms, at both the state and federal levels, to ensure that no individual is convicted of a crime and deprived of his liberty in a manner that is fundamentally unfair, i.e., in a manner that violates due process. See 1 LaFave et al., § 2.7(a) for an exhaustive list of the procedural safeguards required pursuant to the due process clause in the context of criminal proceedings. With regard to the determination of probable cause that a criminal violation has occurred, the Supreme Court clearly held in *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), that an individual being investigated for alleged criminal activity must be afforded substantial opportunity to present evidence, including oral testimony from other witnesses, on his or own behalf and to confront and cross-examine witnesses. "Government officials are charged with knowledge of constitutional developments, including all available decisional law." *Tribble v. Gardner*, 860 F.2d 321, 324 (9th Cir.1988). Consequently, we conclude

that, at the time of the events underlying this lawsuit, it had been clearly established that Plaintiffs have a Fourteenth Amendment right to certain due process safeguards in the context of a probable-cause determination.

We now turn to the second prong of the analysis, whether a reasonable, similarly situated official would have recognized that the challenged conduct violated Plaintiffs' due process rights. The second prong of the analysis, "while requiring a legal determination, is highly fact specific." *Swain v. Spinney*, 117 F.3d 1, 9 (1st Cir.1997).

Plaintiffs Pagán and Aponte were both served with summons to appear before the Blue Ribbon Commission by armed law enforcement agents who visited their homes. According to Executive Order 2001–06, the Commission had the authority to *"require* the assistance of functionaries belonging to the Executive Branch in order to obtain, through the mechanisms provided by law, the appearance of any person or the delivery of any document or object" (emphasis added). *Docket Document No. 7, Exh. 1.* Through the executive order, Defendant Calderón ordered the Department of Justice and the other agencies under the authority of La Fortaleza to provide the Commission with the support necessary for it to successfully complete its mission. *Id.*

At the hearings before the Commission, Plaintiffs were not advised of any specific right that may have attached to them in relation to the Commission's investigation. Plaintiffs were not informed that they had a right to an attorney. Plaintiffs were not advised that they had a right to confront and cross-examine witnesses testifying against them, and they were not given any opportunity to present testimonial evidence from other witnesses. There is nothing in the record showing that Plaintiffs were even informed of the names of

the witnesses testifying against them. Plaintiffs were not permitted to record the proceedings, and they were not even allowed to take notes. One of the Commission's investigators, attorney Vilá–Pérez, explained to Plaintiff Pagán that his requests were denied because the hearing was akin to a grand jury proceeding.

Following these hearings and after the conclusion of the investigation, Defendants held news conferences accusing Plaintiffs of criminal misconduct. More importantly, Defendant Calderón referred the Commission's findings and the evidence it had obtained to the Department of Justice for further action.

We find that on these facts, no reasonable official could have understood that the Blue Ribbon Commission operated in a manner that respected Plaintiffs' due process rights. Accordingly, we conclude that Defendants are not protected by the defense of qualified immunity.

## VI.

### *Conclusion*

It is beyond peradventure that individuals in positions of public trust must maintain the highest standards of integrity with respect to the disbursement of public funds. We do not pass judgment on whether, in fact, Plaintiffs Aponte and Pagán committed misconduct in connection with the transactions investigated by the Blue Ribbon Commission. For purposes of the present case, Plaintiffs' guilt or innocence is irrelevant. We simply hold that the procedures applied by the Commission in its investigations were fundamentally unfair to persons who were being investigated by the Commission, and those procedures infringed upon Plaintiffs' due process rights under the Constitution.

'Secret inquisitions are dangerous things justly feared by free men everywhere.

They are the breeding place for arbitrary misuse of official power. They are often the beginning of tyranny as well as indispensable instruments for its survival. Modern as well as ancient history bears witness that both innocent and guilty have been seized by officers of the state and whisked away for secret interrogation or worse until the groundwork has been securely laid for their inevitable conviction.'

*Hannah,* 363 U.S. 420, 496, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (Douglas, J., dissenting) (internal citation omitted).

We **DECLARE** that the procedures employed by the Blue Ribbon Commission violate the due process clause of the Fourteenth Amendment of the United States Constitution. This court **GRANTS** Plaintiffs' request for a permanent injunction prohibiting Defendants from holding investigative hearings without providing individuals under investigation substantial opportunity to present testimonial and documentary evidence on their behalf and to confront and cross-examine witnesses. This injunction is binding upon Defendants, as well as their agents and employees. *See* FED. R. CIV. P. 65(d).

The exhibits to the Commission's Barbosa 306 and PRIME reports, as well as the other sworn statements and notes of interviews of witnesses obtained by the Commission over the course of these investigations, will be made available to Plaintiffs. The purpose of this disclosure is to partially refund Plaintiffs for the void left by the practices of the Blue Ribbon Commission that negated fundamental fairness to these investigated Plaintiffs. To do otherwise would grant Defendants a windfall to which they are not entitled. This minimal reparation stands pale compared to the injuries suffered.

This court **PARTIALLY GRANTS** Defendants' motion to dismiss the complaint,

and we hereby DISMISS Plaintiffs' First Amendment and equal protection claims. *Docket Document Nos. 13, 16.* We **DENY** Defendants' motions to dismiss Plaintiffs' due process claims, *Docket Document Nos. 13, 16, 25,* and we **DENY** Plaintiffs' motion for summary judgment, *Docket Document No. 21.*[14]

A scheduling order on the remaining triable issues will be entered.

**IT IS SO ORDERED.**

*ADDENDUM "A"*

**CITIZENS INDEPENDENT COMMISSION TO EVALUATE GOVERNMENTAL TRANSACTIONS**

*GUIDELINES FOR INVESTIGATION AND DRAFTING OF REPORTS*

**ARTICLE ONE—LEGAL BASIS AND PURPOSES**

We adopt the following guidelines for investigation by virtue of the authority conferred by Executive Order issued by Honorable Sila Calderon, Governor of Puerto Rico, on January 31, 2001, Administrative Bulletin Number 2001–06, which creates the Citizens Independent Commission to Evaluate Governmental Transactions, and the powers and faculties inherent upon the same.

The objective of the instant guidelines for investigation is to establish the environment of the faculties delegated upon the Commission's personnel to summon witnesses, to take statements, and to require the production of documents, as well as to set forth the guidelines for conducting interviews, and for drafting the findings, product of the analytical process of the evidence compiled. We adopt by reference the provisions and terms defined in the Internal Operational Regulations of the Commission.

The commission, its members and its personnel must maintain the investigative process of the Commission, within the constitutional precepts of due process of law, and equal protection under the law in its dealings with witnesses, individuals, officials, and public employees, who may be invited or summoned to appear before same. All matters pertaining to interview methodology and techniques, and to the taking of statements from witnesses shall be governed by the internal guidelines set forth herein. Said methodology and techniques, as well as the information derived as a product of their application, may not be divulged to persons foreign to the Commission.

**ARTICLE II—DELEGATION OF FACULTIES**

A. We hereby delegate the following faculties upon members of the Commission's personnel who hold functions of investigation, auditing and legal counseling:

1. Summoning witnesses, and conducting interviews, in accordance with the provisions of articles III, IV and V of these guidelines.

2. Transacting the taking of oaths and sworn statements by persons competent to do so.

3. Requesting assistance from pertinent officers of the Executive Branch, in order to achieve the obtaining from any natural or artificial person, of oral testimony and of books, letters, documents, and any other object which may be necessary for a complete knowledge of the matter under investigation.

B. Any exercise of the faculty delegated herein shall be previously consulted

---

14. The issues raised in Plaintiffs' motion for summary judgment have already been addressed by this court in the context of Plaintiffs' request for injunctive relief.

with the full Commission, which must approve same. In case of urgent circumstances, the president may grant approval to a petition formulated and subsequently refer the matter to the Commission for its knowledge and determination.

## ARTICLE III—SUMMONS

A. The members of the Commission's personnel who have been delegated this faculty may summon witnesses verbally, personally, or by telephone for the purposes indicated in Article II, item A of these guidelines, when the witnesses are willing to appear voluntarily.

B. Whenever it may be necessary, or convenient to issue a summons in writing, it shall be done in the established official form, according to the instructions indicated hereinafter:

1. The summons must be addressed to the person to be interviewed, or interrogated. They must clearly indicate the date and time of the appointment, the name of the person before whom the witness must appear, and the physical address and telephone numbers of the place where the meeting or the taking of the statement is going to take place.

2. The summons shall be served adequately in advance of the date and time of the appearance and, if necessary, the summoned person shall be informed to bring with him/her the objects or documents pertaining to the investigation which may be deemed pertinent. The requests for production of evidence shall be as specific as possible.

3. The summons shall contain the signature, name and title of the Commission's Executive Director, or in the alternative, of the President or of any of the Commissioners designated to do so. Once completed, the summons shall be stamped with the seal of the Commission, and it shall be served. This procedure shall take place by personally delivering a copy to the person summoned, or to an authorized representative, who must sign the original or another copy of same. In the alternative, it shall be certified in an appropriate location place within the form that the summons was delivered to the summoned person, by the process server, stating the circumstances of the service. The execution of the service of summons shall not be affected if the person summoned refuses to sign.

4. The summons for the appearance of witnesses or for the production of documents may be served by a member of the Commission's personnel who is not the person who issued same, or by persons working for the governmental agencies designated by the Executive Order to provide support for the Commission. The summons may be served by certified mail with return receipt requested, whenever the correct mailing address is known.

5. If the persons summoned fail to appear on the date, time and place indicated, or if having appeared, they still refuse to testify, completely or partially, and/or if they refuse to deliver, completely or partially, the documents or objects that were requested from them, the member of the Commission's personnel who issued the summons will inform the Commission, which will determine what actions to take. This may include stating the behavior of the summoned person in the report to be rendered by the Commission in its day, and/or requesting the assistance of pertinent officers of the Executive Branch so that, through the mechanisms provide by law, they secure the appearance and testimony of the person, and/or the delivery of the documents or objects required; and/or to refer the matter to the corresponding governmental agency so that said agency

may take whatever measures in their own judgment they deem necessary.

## ARTICLE FOUR—INTERVIEWS AND TAKING OF STATEMENTS

A. The interviews and the taking of statements from witnesses shall be conducted by the member of the Commission's personnel in charge of the investigation, who may be accompanied by another member of the personnel designated do so, who will serve as an assistant in the recording or transcription of the statements in the meeting or as a witness to the events. The person in charge of the investigation may request the presence of a Prosecutor, or a representative from the Department of Justice during any interview, whenever in his/her judgment it may serve to advance the purposes of the interview.

B. The interviews and interrogatories may be recorded on magnetic tape, diskettes, or by any other means such as shorthand or stenography, to be later transcribed and certified as correct by the person who conducted the interview, and the one who made the transcript. They may also be taken in handwriting or directly to a machine while the witness is testifying.

C. During the interviews of witnesses who are not suspects of having incurred in violations of law or of regulations with penal consequences, the presence of attorneys shall not be allowed, nor that of persons foreign to the Commission, except whenever it may be strictly necessary so that the interviewee will reveal all of the information that he/she may have. In those cases, the person accompanying the deponent will be advised that he/she may not interfere in any form or fashion in the investigative process.

D. In order to protect the confidentiality of the evaluations that the Commission must perform, it is absolutely forbidden to provide witnesses with copies of the statements rendered by them, or to allow them to record the interviews or to take notes regarding the questions formulated or their answers. The witness will only be allowed to examine that evidence relevant to the matter under investigation, whenever this may contribute to advance the purposes of the interview.

E. When a person is being interviewed, who is suspected of having incurred in violations of law or of regulations which are of a penal nature, the person shall be advised of his/her constitutional rights. If the person decides to testify voluntarily, the advisements formulated shall be made part of the body of the statement, as well as the fact that the person has assured that he/she has understood same, and that he/she has decided to testify freely, and consciously. If the person should refuse to testify, a minute shall be taken of all of the details of the events that have transpired. The Commission must be notified of this fact, and it will take whatever measures are necessary for the continuation of the proceedings.

F. At any moment during the process of the investigation, in which the person in charge of same has any evidence, further than a mere suspicion, that someone may have incurred in criminal conduct, he/she shall immediately report this to the Commission. Once the commission has verified the preceding, it may refer the matter to the Department of Justice for whatever action said agency may deem appropriate.

G. The Commission shall use for the purposes of its own investigations, all of the evidence obtained by the Department of Justice, or any other governmental agency with powers of investigation, which

said agencies have decided in their sound judgment to share with the Commission.

## ARTICLE FIVE—RECEIVING INFORMATION FROM CITIZENS

A. The spontaneous contribution of data or situations arriving from citizens may be taken through the corresponding form created to that effect, for the analysis and classification of same. When the information submitted does not enter the realm of what the Commission has been entrusted to perform, the person shall be advised regarding that fact, and in appropriate cases, the person will be referred to the pertinent agency.

B. When a person has voluntarily offered to provide information to the Commission, but wishes to do so in an anonymous manner, the member of the Commission's personnel who has attended to that person shall urge the informant to reveal his identity. If the informant insists on remaining anonymous, the information offered shall be received, but said information may only be used to identify matters which may merit investigation in an independent manner. Likewise same shall be done with anonymous information received in writing. The findings to be included in the Commission's report shall be based exclusively on the results obtained through independent investigation, and they will never be based directly upon anonymous information.

## ARTICLE SIX—DRAFTING OF FINDINGS

A. The personnel will keep the Commission duly informed of the progress and results of the investigations, through periodic reports, either verbally or in writing. When drafting the reports, they shall always take into account the constitutional principle of presumption of innocence, and the norm that the actions of governmental agencies are covered by a presumption of regularity and correction.

B. The evidence compiled during the investigation which may serve as a basis for the evaluation and recommendations of the Commission shall be forwarded to the Governor together with the report that the Commission will render to her. Said report may include recommendations in a short-term or long-term basis for the taking of those measures which the Commission may consider convenient, including, but not limited to, suggestions for the adoption of new statutory or regulatory guidelines which govern the transactions under study, or for the modification of existing regulations, or to proceed with administrative, civil or criminal efforts against determined persons.

## ARTICLE SEVEN—EFFECTIVE TERM

These norms shall become effective subsequent to their approval by the Commission.

**CERTIFICATE:** I certify that the instant Guidelines for Investigation and Drafting of Reports were adopted by the Citizens Independent Commission for the Evaluation of Governmental Transactions by unanimous vote of its Commissioners, during the regular meetings of the Commission on February 27, and March 27, 2001.

(Signed; Illegible)
Ms. Brenda N. Leon–Suarez
Executive Director

### ADDENDUM "B"

The Court marks as exhibits two groups of documents related to trial exhibits Plaintiffs' Exhibits 4 and 8. Plaintiffs' Trial Exhibit 4 is the Barbosa 306 Report issued by the Blue Ribbon Commission. Court's Exhibits 4–1, 4–2, 4–3 are the exhibits to the Barbosa 306 Report (4–1 contains the

172

exhibits to the Barbosa 306 Report; 4–2 are Sworn Statements related to the Barbosa 306 investigation, and exhibit 4–3 contains the reports of interviews). Regarding Plaintiffs' Trial Exhibit 8, (the Blue Ribbon Commission Report of the PRIME transaction), the Court's Exhibits are as follows: Court's Exhibit 8–1 corresponds to the PRIME Report Part II, and Court's Exhibit 8–2 corresponds to the Sworn Statements and reports of interviews generated in that investigation.