# United States Court of Appeals
## For the First Circuit

Nos. 01-2705
01-2706

JORGE E. APONTE; DANIEL PAGÁN,

Plaintiffs, Appellees,

v.

SILA MARÍA CALDERÓN; ADOLFO KRANS;
CONJUGAL PARTNERSHIP, KRANS-CALDERÓN,

Defendants, Appellants,

DAVID NORIEGA-RODRÍGUEZ; ILEANA COLÓN-CARLO;
CARMEN RITA VÉLEZ-BORRÁS; PEDRO GALARZA;
PEDRO LÓPEZ-OLIVER; ANGEL HERMIDA.

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José Antonio Fusté, U.S. District Judge]

---

Before
Torruella, Selya and Lipez,
Circuit Judges.

---

Roberto J. Sánchez-Ramos, Solicitor General, with whom Vanessa Lugo-Flores, Deputy Solicitor General, were on brief for appellants Hon. Sila M. Calderón, personally and in her official capacity as Governor of the Commonwealth of Puerto Rico, and Adolfo Krans.
Rafael Escalera-Rodríguez, with whom Reichard & Escalera and Néstor J. Navas-D'Acosta were on brief for appellants David Noriega-Rodríguez, Ileana Colón-Carlo, Carmen Rita Vélez-Borrás, Pedro Galarza, Pedro López-Oliver, and Angel Hermida.
John F. Nevares, with whom Carlos R. Ramírez, John F. Nevares & Associates, P.S.C., and Carlos Lugo-Fiol were on brief for appellees.

---

March 22, 2002

---

**TORRUELLA**, **Circuit Judge**. Defendants-appellants challenge the district court judgment granting plaintiffs-appellees injunctive and declaratory relief. See Aponte v. Calderón, 176 F. Supp. 2d 135 (D.P.R. 2001). Plaintiffs-appellees originally brought suit challenging the constitutionality of the Independent Citizens' Commission to Evaluate Government Transactions ("Blue Ribbon Commission" or "Commission"), which was created by appellant Sila M. Calderón through an executive order. They alleged, inter alia, that the Commission violated appellees' rights to due process of law, as guaranteed by the Fourteenth Amendment of the United States Constitution. The district court agreed and entered a permanent injunction forbidding the Commission from engaging in future investigations without instituting trial-type procedures. Because we find that the Commission's investigation implicates no constitutionally protected liberty or property interest of the appellees, we reverse the district court's grant of injunctive and declaratory relief.

## I. Factual Background

### A. The Creation and Structure of the Blue Ribbon Commission

Appellant Sila María Calderón was elected Governor of the Commonwealth of Puerto Rico in November 2000. Shortly after taking office in January 2001, she promulgated Executive Order No. 2001-06 ("Order"). The Order states that there is a "pressing need" to make "proper and efficient use of public resources" and to complete "the total erradication [sic] of government corruption." To

further that effort, the Order creates the "Independent Citizens' Commission to Evaluate Government Transactions . . . for the purpose of evaluating significant government transactions."

The Order gives the Blue Ribbon Commission the power to evaluate transactions accomplished by the executive branch of the Puerto Rican government. These transactions may have been completed by either the current or previous administrations and must "have the potential of substantially impacting on areas such as the government's structure, the public treasury, the country's economy and infrastructure, or the citizenry's trust in government institutions." To further these evaluations, the Order gives the Commission the authority to request information from natural and artificial persons, to require the assistance of the executive branch, and to issue reports to the Governor, including both the findings of any investigation and any recommendations. These recommendations may include the adoption of "new statutory or regulatory rules," the modification of existing rules, and further proceedings, either administrative, civil, or criminal, against certain persons. The Order also provides that the Commission shall operate with strict confidentiality. Only the Governor has the power to publicize the findings, recommendations, or evidence collected by the Commission.

The Governor also has the exclusive power to name Commission members. She originally appointed appellants David Noriega-Rodríguez, Ileana Colón-Carlo, Carmen Rita Vélez-Borrás, Pedro Galarza, and Pedro López-Oliver. Noriega-Rodríguez was made

Chairperson. Galarza and López-Oliver have both resigned from the Commission, and appellant Angel Hermida replaced López-Oliver.[1]

The Commission has the power to adopt internal operating rules. Pursuant to that power, the Commission promulgated both Operating By-Laws ("By-Laws") and Guidelines for Investigation and Drafting of Reports ("Guidelines"). Only the By-Laws were made public by the Commission. The unpublished Guidelines, however, provide most of the substantive procedures that the Commission and its staff follow in conducting their investigations.[2] These procedures include the ability of the Commission to request officers of the executive branch to secure the appearance and testimony of reluctant witnesses, using appropriate legal mechanisms. During interviews, the Commissioners or their staff may record testimony in a variety of ways, including handwritten notes. Witnesses are not allowed to take notes, record their testimony, or obtain copies of their statements. This is ostensibly to protect the confidentiality of the Commission's investigations. Those witnesses who are not considered suspects are not allowed to have an attorney present. However, those witnesses who are suspected of violating laws or regulations of a

---

[1] Adolfo Krans, Governor Calderón's husband, is the final appellant. Appellees originally sued Krans, the conjugal partnership of Krans and Governor Calderón, the various unnamed spouses of the Commission members, their conjugal partnerships, and several additional unnamed defendants.

[2] The district court published the Guidelines by attaching a copy to its opinion. See Aponte v. Calderón, 176 F. Supp. 2d at 168-172. Before this publication, the Guidelines had never been made public. Indeed, the fact that these procedures existed had never been made public.

-4-

penal nature are to be advised of their constitutional rights, including their right against forced self-incrimination. The Guidelines also require Commissioners to report any evidence that creates more than a mere suspicion of criminal activity. The Commission, once it has verified such evidence, may refer the matter to the Puerto Rican Department of Justice.

It is also important to note what powers the Blue Ribbon Commission does not have. It does not have the power to independently initiate or file any civil, criminal, or administrative charges. It can only recommend that other agencies do so. Most importantly, the Commission cannot adjudicate criminal liability or make probable cause determinations.

## B. The Investigations and Publication of Reports Relating to Appellees

The Blue Ribbon Commission has completed reports on three transactions. Two of those are implicated in this case. The first concerns the lease and purchase of a building, located at Barbosa Avenue 306, and an adjacent parking lot ("Barbosa Report"). It discusses both appellees. The second details the relationship between the Department of Natural and Environmental Resources, the Solid Waste Authority, and the Puerto Rico Infrastructure Management Group, Inc., a private entity ("PRIME Report"). It discusses only appellee Daniel Pagán. The district court concluded, after holding a hearing, that both reports "find that there is probable cause to believe that violations of Puerto Rico criminal law have occurred." Aponte, 176 F. Supp. 2d at 144.

Both plaintiffs-appellees served as high-ranking Puerto Rican officials under former Governor Pedro Rosselló. Appellee Jorge E. Aponte was Director of the Office of Management and Budget. Appellee Daniel Pagán was Secretary of the Department of Natural and Environmental Resources. Both Aponte and Pagán held their positions in the Puerto Rican government until December 31, 2000, when Governor Rosselló's term ended.

The Commission interviewed appellee Aponte on April 19, 2001, regarding the Barbosa transaction. This interview occurred after Aponte received a letter at his home, requesting his appearance at a hearing. Originally, the hearing was scheduled for March 29, 2001, but Aponte did not attend due to his concerns about the Commission. Instead, he hand-delivered a letter, which requested a copy of the Commission's by-laws, the subject matter of the hearing, an opinion letter by the Puerto Rican Secretary of Justice explaining the legal basis for the Commission to compel witnesses to attend hearings, and any information on the appointment of counsel to assist him at the hearing. When he delivered the letter, the Commission's staff informed Aponte that he was not entitled to appointment of counsel. He subsequently received a copy of the Order, the By-Laws, and a letter explaining that the Commission was interested in his involvement in the Barbosa transaction. The letter also rescheduled the hearing for April 19.

Aponte attended the hearing on April 19, based in part on the assurances of the Commission's staff that his testimony was

needed only to authenticate certain documents. He did not believe that he, himself, was under investigation for misconduct, and while he knew that his attendance at the hearing was not required by law, he believed that the Commission would draw negative inferences should he refuse to attend. Aponte also concluded, based on his reading of the Order and the By-Laws, that the Commission could require him to appear under compulsion of legal process should he refuse to attend voluntarily.

At the hearing, Aponte objected to the Commission as unconstitutional. He asked to take notes of the proceedings and to have a copy of the investigators' notes, but these requests were denied. Aponte rejected the Commission's request to have a stenographer record the interview. At no point during the interview did anyone advise Aponte of any constitutional rights.

Appellee Pagán was interviewed on April 25, 2001, after an armed agent of the Puerto Rico Department of Justice Special Investigations Bureau ("NIE")[3] delivered a summons to Pagán's home. After receiving the summons, Pagán informed the Commission that he was willing to cooperate, despite his belief that the Commission did not have the power to compel his appearance. However, Pagán also believed, based on his former experiences, that he was "required" to appear, although not under legal compulsion. He knew of individuals who had failed to cooperate with NIE investigations and had been subject to formal actions.

---

[3] NIE is the Spanish acronym.

Like his fellow appellee, Pagán was interviewed regarding the Barbosa transaction. At the time of his interview, the Commission did not suspect Pagán of any criminal conduct, therefore, the Commission did not inform Pagán of any rights that might have attached had he been a suspect. He requested permission to record or take notes during the hearing, but the Commission denied both requests. The Commission's staff did take written notes on both Pagán's oral testimony and documentary evidence.

On May 9, 2001, Governor Calderón, accompanied by some of the Commissioners, held a press conference at which she discussed the Commission's findings and released copies of the Barbosa Report. The Governor subsequently referred the matter to the Puerto Rican Secretary of Justice. The district court found that the report accuses both appellees of criminal misconduct (although the report itself does not speak in terms of crimes or criminal statutes). The report also contains extensive analysis and conclusions regarding the transaction's utility and wisdom, discusses specific mistakes, and recommends improvements so that similar mistakes do not occur in the future.

At the time of the press conference, neither appellee had received a copy of the Barbosa Report nor been given an opportunity to respond to any charges contained in the report. Pagán later obtained a copy of the Barbosa Report, but he could not review the evidence relied upon by the Commission (which had been attached to the report submitted to the Governor).

The Commission, as part of a later investigation, summoned Pagán to appear at a second hearing, which was to cover the remodeling of the Barbosa building and a contract between PRIME and the Solid Waste Authority. Pagán chose not to appear at this hearing.

A few months later, the Commission finished the PRIME Report and delivered it to the Governor. As with the Barbosa report, the Governor and several Commissioners held a press conference where the report and its findings were discussed. The PRIME Report concludes that Pagán "improperly intervened" in the bidding process of the transaction and that Pagán also caused certain documents to "disappear," requiring the awarded bid to be annulled. It also contains a lengthy analysis of the entire transaction and recommendations for future improvements. Again, Governor Calderón forwarded the report to the Puerto Rican Secretary of Justice for further investigation and proceedings. A second PRIME report was later delivered to Governor Calderón, who, in turn, referred it to the Secretary of Justice.

## II.  Procedural Background

The district court decided this case after holding a hearing and entertaining various dispositive motions by the parties. The issues raised in these various motions included: (1) whether appellees had stated a valid due process claim; (2) whether appellants are protected by the doctrine of qualified immunity; (3) whether Governor Calderón is entitled to absolute immunity; (4) whether appellees' motion for a preliminary injunction should be

granted; and (5) whether the district court should decline to exercise jurisdiction over appellees' state-law claims.

On November 6-8, 2001, the district court held a hearing. This hearing was originally scheduled to address appellees' motion for a preliminary injunction. To prepare for that hearing, the district court issued an order, dated October 16, 2001, advising the parties which issues the court expected to cover in the hearing. The court outlined the final issue as follows: "What other evidence, aside from that properly submitted in a preliminary injunction hearing, do the parties expect that they would present if the case were to be tried on the merits? See Fed. R. Civ. P. 65(a)(2)."[4] At the conclusion of the hearing, the district court stated, "I think that there is no reason why I should not give a final adjudication. . . . That's exactly what I intend to do under Rule 65." Neither party objected.

Thereafter, on November 29, 2001, the district court issued the decision that is the subject of this appeal. After deciding that the case was ripe and not an appropriate case for abstention, the court held that (1) Governor Calderón is not entitled to absolute immunity; (2) appellants are not entitled to qualified immunity; (3) the Commission violated appellees' rights to procedural due process, entitling appellees to injunctive and declaratory relief; and (4) the Commission did not violate

_____

[4] Rule 65(a)(2) of the Federal Rules of Civil Procedure provides, in relevant part: "Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

appellees' right to freedom of association or to equal protection of the laws. The court did not decide the state-law issues raised in appellees' complaint or determine damages.

### III. Discussion

Appellants challenge the district court's decision on several grounds. First, they raise a procedural issue as to the court's invocation of Federal Rule of Civil Procedure 65. Second, they contest the court's substantive decision that the Commission violated appellees' due process rights. Third, they argue that Governor Calderón is entitled to absolute immunity regarding her establishment of the Blue Ribbon Commission through an executive order. Fourth, appellants argue that they are entitled to qualified immunity. We address each in turn.

### A. Rule 65(a)(2)

The Federal Rules of Civil Procedure allow a court to consolidate a preliminary injunction hearing with a trial on the merits. See Fed. R. Civ. P. 65(a)(2). However, the court must provide the parties with "'clear and unambiguous notice'" of its intent to consolidate. Univ. of Tex. v. Camenish, 451 U.S. 390, 395 (1981) (quoting Pughsley v. 3750 Lake Shore Drive Coop. Bldg., 463 F.2d 1055, 1057 (7th Cir. 1972)). This notice must be given sufficiently early to allow the parties time to assemble and present their evidence. Id. However, any right to object to the court's timeliness in giving notice will be lost if a party does not object contemporaneously with the court's notice of consolidation. K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907,

-11-

913 (1st Cir. 1989) (holding that appellant waived its right to complain when the court announced its intention to consolidate during the second day of a preliminary injunction hearing and appellant failed to object).

Here, the record is clear. The district court signaled the possibility that it might consolidate the preliminary injunction hearing with a trial on the merits in its order dated October 16, 2001. While this first notice is arguably ambiguous, we need not stop there. At the end of the hearing, the court announced, unambiguously, that it would consolidate under Rule 65. Appellants failed to object at either juncture, consequently waiving their right to raise this issue now. Therefore, we proceed to the merits of the case.

**B. The Merits**

After the consolidated trial on the merits, the district court granted a permanent injunction forbidding appellants from "holding investigative hearings without affording individuals under investigation substantial opportunity to defend, among other rights, the right to present testimonial and documentary evidence on their behalf and to confront and cross-examine witnesses." Aponte, 176 F. Supp. 2d at 165. Appellants contest the district court's decision, and we agree that the district court erred in concluding that these actions provide a basis for the issuance of the injunction.

Generally, we review a grant of a permanent injunction for abuse of discretion, A.W. Chesterton Co. v. Chesterton, 128

-12-

F.3d 1, 5 (1st Cir. 1997), but we always review questions of law de novo. Arecibo Cmty. Health Care, Inc. v. Puerto Rico, 270 F.3d 17, 22 (1st Cir. 2001). We review factual findings for clear error. See Water Keepers Alliance v. United States Dep't of Def., 271 F.2d 21, 30 (1st Cir. 2001) (applying clearly erroneous standard to review of factual findings).

In order to grant a permanent injunction, the court must find four elements: (1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury without an injunction; (3) the harm to plaintiffs would exceed the harm to defendants from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction. United States v. Mass. Water Res. Auth., 256 F.3d 36, 51 n.15 (1st Cir. 2001). While appellants challenge the district court's determination on all four prongs, we find the first dispositive and, therefore, decline to address the others.

Here, the district court found that appellees prevailed on the merits of their procedural due process claim. Aponte, 176 F. Supp. 2d at 155-63. A threshold requirement for a successful procedural due process claim is to demonstrate the implication of a constitutionally protected interest in life, liberty, or property. Romero-Barceló v. Hernández-Agosto, 75 F.3d 23, 32 (1st Cir. 1996).

Appellees argue that two separate liberty or property interests trigger due process protections in this case. First, they assert a right to be free from criminal investigation and

-13-

prosecution. Second, they maintain that the Puerto Rican Constitution establishes a protected liberty interest in reputation. We address each of these arguments in turn.

### 1. Interest in being free from criminal investigation and prosecution

The district court concluded that appellees "have a fundamental, constitutionally protected liberty interest in being free from investigation and prosecution for criminal offenses in a manner that tramples upon the procedural protections afforded by the Fourteenth Amendment." Aponte, 176 F. Supp. 2d at 156. To support this conclusion, the court looked to Jenkins v. McKeithen, 395 U.S. 411 (1969), which it determined governs this case. Aponte, 176 F. Supp. 2d at 160. We disagree and hold that appellees have asserted no constitutionally protected interest because there has been no adjudication of criminal liability or of appellees' legal rights.

In Jenkins, a plurality of the Supreme Court held that the subject of a public investigation carried out by the Labor-Management Commission of Inquiry ("Louisiana Commission") stated a valid due process claim when he challenged the procedures of the Louisiana Commission. 395 U.S. at 431. A key finding on which the plurality relied is that the Louisiana Commission was "empowered to be used and allegedly [was] used to find named individuals guilty of violating the criminal laws." Id. at 428. Therefore, the Louisiana Commission "exercise[d] a function very much akin to making an official adjudication of criminal culpability." Id. at

-14-

427. This finding distinguishes <u>Jenkins</u> from the earlier case of <u>Hannah</u> v. <u>Larche</u>, 363 U.S. 420 (1960).

<u>Hannah</u> addressed whether due process rights were implicated by public investigations of the Civil Rights Commission. This commission had been charged by Congress with investigating allegations of voting deprivations. <u>Id.</u> at 421-23. Several citizens, called as witnesses by the commission, filed suit to enjoin the investigation, alleging infringements of their due process rights.[5] <u>Id.</u> at 423-30. The Court began by noting that the Civil Rights Commission "does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. . . . Nor does it indict, punish, or impose any legal sanctions." <u>Id.</u> at 441. The Court then continued to explain that when there is no adjudication of legal rights, the due process clause is not implicated to the same degree:

> [W]hen governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a <u>general fact-finding investigation</u> is being conducted, it is not necessary that the full panoply of judicial procedures be used.

<u>Id.</u> at 442 (emphasis added). The Court also looked, quite specifically, at the use of other investigative bodies in our

_____

[5]  Specifically, the plaintiffs wanted to know on what charges they were being investigated and on the basis of whose complaint. <u>Id.</u> at 441-42. Plaintiffs also argued that they had the right to cross-examine the complainants and other adverse witnesses. <u>Id.</u>

-15-

government.  It found a long history of fact-finding investigations that used procedures similar to those employed by the Civil Rights Commission.  Id. at 443-52.  To stress this point, the Court went so far as to append an extensive list of various administrative agencies which conduct investigations without trial-like rights attaching.  Id. at 454-92.  Because the Court found that the Civil Rights Commission was more like an investigative agency, it held that the plaintiffs' due process rights had not been violated.

The Court has steadfastly maintained this distinction between general fact-finding investigations and adjudications of legal rights.  It is precisely on this point that Jenkins turns.  There, the Court distinguished the Louisiana Commission from the Civil Rights Commission by saying:

> We are not presented with a case in which any injury to appellant is merely a collateral consequence of the actions of an investigatory body.  Rather, it is alleged that the very purpose of the [Louisiana] Commission is to find persons guilty of violating criminal laws without trial or procedural safeguards, and to publicize those findings.

395 U.S. at 424 (emphasis added).  The Court noted that the Louisiana Commission was both required to make probable cause findings and able to file charges against individuals. Id. at 416-17.  Furthermore, the Louisiana Commission was "concerned only with exposing violations of criminal laws by specific individuals." Id. at 427.  These specific characteristics of the commission made it more like an adjudicatory body than an investigatory body.  Therefore, due process rights attached.

-16-

In contrast, it is clear that investigations conducted by administrative agencies, even when they may lead to criminal prosecutions, do not trigger due process rights. In <u>SEC</u> v. <u>Jerry T. O'Brien, Inc.</u>, 467 U.S. 735 (1984), the Court considered a challenge to a private SEC investigation.[6] The plaintiffs challenged the ability of the SEC to issue third-party subpoenas without informing the parties under investigation. The Court, once again, looked to the difference between adjudication and investigation: "the Due Process Clause . . . is [not] offended when a federal administrative agency, without notifying a person under investigation, uses its subpoena power to gather evidence adverse to him. The Due Process Clause is not implicated under such circumstances because an administrative investigation adjudicates no legal rights." <u>Id.</u> at 742. The key distinction is that the SEC investigated whether violations of various securities laws may have occurred, not whether plaintiffs should be held legally responsible for any such violations. For plaintiffs to be held legally responsible, they would have to be found guilty after a formal adjudication, during which full due process rights would attach.

To the extent that the district court found that appellees have a constitutionally protected interest in being free

---

[6] Because the SEC conducted a private investigation, <u>Jerry T. O'Brien</u> bears a close resemblance to this case, where the Commission's investigations are conducted confidentially. However, the parallel is not complete. In <u>Jerry T. O'Brien</u>, it is unclear whether the SEC had the power to make the results of its investigation public. Here, the Commission's findings have been made public by Governor Calderón.

from <u>investigation</u>, the court erred as a matter of law. The foregoing discussion shows that investigations, alone, do not trigger due process rights. There must also be an adjudication. Without an adjudication of legal rights, <u>Hannah</u> and <u>Jerry T. O'Brien</u> are clear: the Due Process Clause does not require that "the full panoply of judicial procedures be used." <u>Hannah</u>, 363 U.S. at 442.

However, it is not clear whether the district court also found that there was an adjudication of appellees' legal rights. <u>Aponte</u>, 176 F. Supp. 2d at 156 (stating that appellees have an interest in being free from both investigation and prosecution). We know that the Blue Ribbon Commission investigates government transactions in private, and, thereafter, makes a variety of recommendations. Included within those recommendations may be the suggestion that criminal, civil, or administrative actions be brought against certain individuals. In both the Barbosa and PRIME Reports, the Commission recommended that further actions be taken against appellees. The question, then, is whether the Commission has adjudicated appellees' legal rights in making these recommendations.

The question of whether there has been an adjudication does not turn on the language of the Order or the Commission's self-described role. Rather, it is a functional question. <u>See</u> <u>Cooper</u> v. <u>Salazar</u>, 196 F.3d 809, 815 (7th Cir. 1999) (holding that administrative investigation into alleged civil rights violations which resulted in determination of whether there was "substantial

-18-

evidence" on which to proceed was a functional adjudication because, in event of negative determination, claimant could only appeal denial of claim to state supreme court).  If any action of the Commission alters the appellees' legal rights, then there has been an adjudication.  Hannah, 363 U.S. at 441; Cooper, 196 F.3d at 815.

Without making an explicit finding, the district court suggests that the Commission conducts adjudications because it "makes actual findings that named individuals are guilty of criminal violations as part of a process of criminal prosecution." Aponte, 176 F. Supp. 2d at 161.  However, the court's findings as to the subsidiary facts belies the conclusion.  See Alfaro De Quevedo v. De Jesús Schuck, 556 F.2d 591, 593 (1st Cir. 1977) (finding that factual findings which are internally inconsistent are clearly erroneous).  Additionally, our independent review of the Barbosa and PRIME Reports shows that the district court's conclusion is clearly erroneous.[7]  See Fed. R. Civ. P. 52(a) (establishing that factual findings "shall not be set aside unless clearly erroneous"); see also Water Keepers Alliance, 271 F.2d at 30 (applying clearly erroneous standard in review of preliminary injunction denial).

When the district court referred to the "actual findings" of criminal conduct, Aponte, 176 F. Supp. 2d at 161, it was

_____

[7] The district court's conclusion could be characterized as either a factual finding or a mixed question of fact and law.  Since the finding is clearly erroneous, it does not matter how we characterize it.  Therefore, we decline to decide this issue.

-19-

apparently referencing the probable cause determinations that the court found in the Barbosa and PRIME Reports.[8] See id. at 144 ("probable cause to believe that violations of Puerto Rico criminal law have occurred"). However, a close reading of the district court's factual findings shows that the Commission does not make binding probable cause determinations. Rather, the Commission simply recommends that individuals be investigated further. The district court, itself, said that the Commission only makes "accusations of criminal misconduct." Id. at 148. Throughout its discussion, the district court said that the Barbosa and PRIME Reports "accuse" appellees of crimes and that appellees "are at risk of prosecution." See, e.g., id. at 157. Furthermore, it also recognized that appellees have not yet been indicted. See id. at 156 (noting that appellees "have not yet been formally charged"). Finally, the district court observed that, "the reports issued by the Blue Ribbon Commission are not obligatory, and the Commission can only offer recommendations that [Governor] Calderón refer a particular matter to the Department of Justice for prosecution." Id. at 160. Therefore, it is unclear how the court concludes that "[t]he Commission makes actual findings that named individuals are guilty of criminal violations as part of a process of criminal prosecution." Id. at 161. In fact, this finding is internally inconsistent with the numerous findings that the reports only

---

[8] We assume, arguendo, that determining probable cause could be an adjudication sufficient to trigger the due process clause. It is unnecessary to decide that question here because it is clear that the Commission does not even make probable cause determinations.

-20-

accuse appellees of criminal conduct and that the Commission's recommendations are neither binding nor work as a formal indictment or charge against appellees.

The district court opinion is unclear on whether the Barbosa or PRIME Reports actually accuse appellees of specific crimes. See, e.g., id. at 157 ("The Commission concluded that [appellee] Pagán had committed undue intervention in the performance of contracts, bidding procedures or government operations in violation of Section 4353a of the Penal Code . . . ."). Therefore, we conducted an independent review of the evidence. We conclude that the reports do accuse appellees of misconduct. For example, the Barbosa Report finds, "at the very least [appellees] were grossly negligent." The PRIME Report says appellee Pagán "improperly intervened" in the bidding procedures and, in its most damning accusation, concludes that he "ordered the president of the bid board to cause the disappearance of the documents." However, the reports never make reference to any provisions of the Puerto Rican Penal Code. They never accuse appellees of specific criminal conduct. Furthermore, the reports are very clear that they only suggest referring the matters to various administrative departments for further investigation. There is no specific recommendation that either appellee be prosecuted, much less any finding of probable cause or actual institution of legal action against appellees. Therefore, the district court's conclusion that the reports make specific and binding determinations of criminal conduct is clearly erroneous.

See <u>United States</u> v. <u>Ortiz</u>, 177 F.3d 108, 109 (1st Cir. 1999) (holding that to the extent that a district court's findings are inconsistent with the uncontroverted evidence, they are clearly erroneous).

Additionally, the Order, By-Laws, and Guidelines are all explicit that the Commission is not given the power to adjudicate legal rights. The Commission cannot independently initiate or file any civil, criminal, or administrative charges. Rather, the Commission is only given the power to make recommendations to the Governor, who then makes her own determination about whether to pursue further investigations.

Therefore, we find that the Commission did not and cannot adjudicate the legal rights of appellees or any other individual. There is no adjudication, functional or otherwise. Accordingly, the Due Process Clause has not been triggered.

With this conclusion in mind, we would like to emphasize the district court's conclusion that appellees "have a constitutionally protected liberty interest in ensuring that the state acts in accordance with due process standards in the <u>prosecution</u> of [appellees]." <u>Aponte</u>, 176 F. Supp. 2d at 158 (emphasis added). The fact that the district court failed to consider the difference between a prosecution and an investigation does not undercut this point. If appellees are ever prosecuted, they will be entitled to the full protections of the Due Process Clause, just like any other individual.

-22-

## 2.  Interest in reputation

Appellees assert another interest, which they claim serves as a valid basis for their due process claim: a liberty interest in their reputations.  However, Paul v. Davis, 424 U.S. 693 (1976), held that damage to one's reputation alone does not trigger the protections of the Due Process Clause.  Id. at 701. Reputational harms must be attached to some other alteration in status in order to raise a valid due process claim.  Id. at 711-12. Appellees claim to satisfy this requirement by invoking the Puerto Rican Constitution.  While the Puerto Rican Constitution does include a specific protection for reputation, see P.R. Const. art. II, § 8, we conclude that the Puerto Rican courts have not afforded greater protections to reputation than stateside jurisdictions. Furthermore, there is no indication that appellees have lost any legal rights because of the alleged defamation by government actors.  Since appellees can point to no alteration in their legal status attached to any reputational injury, we hold that appellees have not asserted a constitutionally protected interest in their reputations.

Paul is very clear.  There must be a legal alteration in plaintiff's position before the courts will recognize a procedural due process claim:

> It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause.  These interests attain this constitutional status by virtue of the fact

> that they have been initially recognized and protected by state law, and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status.

Paul, 424 U.S. at 710-11. The fact that a state accords protections to one's reputation by allowing one to bring a tort action does not create a legal status which is altered when the state is the alleged defamer. Id. at 711-12.

The question presented here is whether the fact that Puerto Rico enshrines protection for reputation in its constitution creates a legal status which is altered when the Puerto Rican government allegedly defames one of its citizens. While this issue has arisen before, we have never had to decide it. See, e.g., Romero-Barceló, 75 F.3d at 33.

Based on the Supreme Court's decision in Paul, we have consistently held that "the injury to reputation must be accompanied by a change in the injured person's status or rights (under substantive state or federal law)." Beitzell v. Jeffrey, 643 F.2d 870, 878 (1st Cir. 1981); see also Brennan v. Hendrigan, 888 F.2d 189, 195 (1st Cir. 1989) ("reputational injury must coincide with some other 'alteration of status'" (citing Paul, 424 U.S. at 709-10)). We have termed this a "defamation-plus" test. Celia v. O'Malley, 918 F.2d 1017, 1021 (1st Cir. 1990). One example of a successful "defamation-plus" claim is an allegation that a stigmatization has occurred in connection with a termination in employment. See Brennan, 888 F.2d at 196. Appellees have asserted nothing similar to this traditional "plus" factor.

-24-

Instead, they rely only on the assertion that Puerto Rico law creates a different regime. We have suggested that state law may broaden the liberty interests accorded due process protections. See Silva v. Worden, 130 F.3d 26, 33 (1st Cir. 1997) (noting that Massachusetts "may have a slightly broader conception of the liberty interests protected by due process"). Therefore, it is conceivable that Puerto Rican law could accord a protected liberty interest in reputation without appellees needing to allege an additional deprivation.

The Puerto Rico Supreme Court has made clear that Puerto Rico's Constitution provides sweeping human rights protections: "Our Constitution recognizes and grants some fundamental rights with a more global and protective vision than does the United States Constitution." López Vives v. Police of P.R., 18 P.R. Offic. Trans. 264, 273 (1987). Furthermore, the Puerto Rico Constitution should be construed broadly in regard to these rights. Id. Despite these broad human rights protections, it does not necessarily follow that the Puerto Rican law protects reputation so broadly as to make it a protected liberty interest under the United States Constitution. To evaluate this question, it is necessary to look more closely at the protections Puerto Rico provides.

Puerto Rico law creates a right of action for defamation and libel in three separate sources. See Giménez Alvarez v. Silén Maldonado, 131 P.R. Dec. 91, 97-98 (1992). First, Article II, section 8 of the Puerto Rico Constitution provides, "Every person has the right to the protection of law against abusive attacks on

his honor, reputation and private or family life." This provision provides a right of action without enabling legislation. <u>Porto</u> v. <u>Bentley P.R., Inc.</u>, 132 P.R. Dec. 331, 343 (1992). Second, the Libel and Slander Act of 1902 provides a right of action. 32 L.P.R.A. §§ 3141-49. This act draws from the common law tradition, <u>Porto</u>, 132 P.R. Dec. at 344 n.8, and has been modified by pronouncements of the United States Supreme Court. <u>See</u> <u>id.</u> at 344-46. Third, there is a statutory right drawn from the Civil Code. 31 L.P.R.A. § 5141; <u>see also</u> <u>Giménez Alvarez</u>, 131 P.R. Dec. at 98.

In interpreting these various sources of law, the Puerto Rico Supreme Court has explicitly said that Puerto Rico law on libel and slander follows the common law tradition. <u>Villanueva</u> v. <u>Hernández Class</u>, 28 P.R. Offic. Trans. 618, 128 P.R. Dec. 618, 646 (1991) ("Our libel and slander law -- which follows the Anglo-Saxon common law . . . ."). Beyond this overt acknowledgment, the Puerto Rico courts frequently cite stateside jurisdictions when interpreting their laws protecting personal reputation. <u>See</u>, <u>e.g.</u>, <u>Porto</u>, 132 P.R. Dec. at 349; <u>Villanueva</u>, 128 P.R. Dec. at 647-48; <u>González Martínez</u> v. <u>López</u>, 18 P.R. Offic. Trans. 229, 236 (1987). Therefore, as currently developed by Puerto Rican courts, there is nothing that suggests that we should treat the protections accorded to reputation by Puerto Rico any more broadly than those granted in other United States jurisdictions.

Since the law in Puerto Rico appears to be no different, functionally, from the general common law protections for reputation, we cannot credit appellees' argument that reputation

-26-

alone, in Puerto Rico, rises to a liberty interest accorded independent protection under the Due Process Clause of the United States Constitution. Therefore, appellees have failed to demonstrate a protected liberty interest in their reputation.

### 3. Appropriateness of injunctive and declaratory relief

Based on the foregoing discussion, it is clear that appellees have failed to assert any protected interest in life, liberty, or property that would trigger the protections of the Due Process Clause. In holding otherwise, the district court erred. Consequently, the district court abused its discretion when it issued the permanent injunction.

The district court also entered a declaratory judgment that "the procedures employed by the Blue Ribbon Commission in the investigation of public corruption are fundamentally unfair and contravene the requisites of the due process clause of the Fourteenth Amendment." As this judgment was based on the finding that appellees succeeded on the merits of their due process claim, the district court also erred in awarding declaratory relief.

## D. Absolute and Qualified Immunity

Because appellees' federal claims fail on the merits, we see no need to probe whether, or to what extent, the appellants may be immune from damages.

### IV. Conclusion

Pursuant to the above discussion, we vacate the permanent injunction and reverse the declaratory judgment issued against

defendants-appellants.  Finally, we remand to the district court with instructions to enter judgment in favor of defendants-appellants on the due process claim and to dismiss the remaining state law claims.

**<u>Vacated, reversed and remanded</u>**.